KAISER INDUSTRIES CORPORATION

v.

The UNITED STATES.

No. 488–59.

United States Court of Claims.

Jan. 22, 1965.

George C. Butler, Richland, Wash., for plaintiff.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to former Rule 45(a) (now Rule 57(a)) to Trial Commissioner Saul Richard Gamer, with directions to make findings of fact and recommendations for a conclusion of law. The commissioner has done so in an opinion and report filed March 6, 1964. Exceptions to the commissioner's findings were made by the parties, briefs were filed by the parties and the case was submitted to the court on oral argument by counsel. Since the court is in agreement with the opinion, findings and recommendation of the trial commissioner, with minor modifications as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover of and from the United States in the amount of seventy-one thousand, five hundred nine dollars and four cents ($71,509.04), and judgment is entered for plaintiff in this matter in this amount.

Commissioner Gamer's opinion, as modified by the court, is as follows:

A construction contractor here claims approximately $185,000 as an equitable adjustment under the "Changed Conditions" article of its contract with the Army Corps of Engineers.[1] This article

---

1. Plaintiff, a Nevada corporation, is the successor in interest to the General Construction Company, an Oregon corporation, which actually performed the contract. The term "plaintiff" will be used herein to refer to plaintiff as if it were the performing contractor.

provides that the contractor shall receive such an adjustment in its contract price if it encounters either "(1) subsurface or latent physical conditions at the site differing materially from those indicated in the contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for" in the contract.

Plaintiff's contract was for the repair of stone revetments at various locations along the shores of the McNary Dam Reservoir on the Columbia River in the States of Washington and Oregon. The embankment slopes were to be reshaped and riprap and random rock were to be placed thereon. The original contract amount, based on estimated quantities, was $1,028,466.

In this part of the country it is difficult to locate suitable rock for such a project. Most of the rock in the region is of basalt formation from lava flows and a considerable part of it is of a type that breaks too small for use as riprap of the size required. Defendant itself owned two quarries which the contract recited were "approved" as sources of rock for the project and which were made available to the successful bidder without charge. Other quarry sources could not be used without the permission of the contracting officer. In any event, as a practical matter there were no other known quarries which were believed to contain sufficient quantities of the kind of rock required and were so located as to be economically feasible for use under the contract. Defendant had spent considerable time over a period of years in making studies of potential sources of rock suitable for such work.

Plaintiff[2] selected one of the two quarries made available by defendant, known as the Hover Quarry. However, after a relatively short and difficult time during which, with an abnormal amount of waste, it was able to obtain some suitable rock, it abandoned the quarry. What rock that was in the quarry which could, in any economical fashion, be used to complete the requirements of the project was, insofar as any reasonably foreseeable successful operation was concerned, exhausted when plaintiff abandoned it. Outside of a satisfactory vein of rock which gave out within the first few weeks of operation, and from which plaintiff was able to produce the largest sized rock required by the contract,[3] most of the rock plaintiff handled shattered, crumbled, and pulverized on handling. As operations proceeded further into the original cut of satisfactory rock, as well as in other areas, it became increasingly difficult to find sound rock. Other areas probed in the face of the quarry produced rotten and decayed rock interspersed with boulders, some of which were not suitable for production purposes. When apparently sound rock faces were blasted, the rock would crumble. Powder blast reductions to absolute minima failed to cure the situation. Seemingly good rock simply flaked or deteriorated when dug or, when loaded with the shovel on to the trucks and the barges, would shatter and disintegrate. Although it was originally reasonable to assume waste of approximately 15–20 percent, plaintiff's waste was over 60 percent. By the time plaintiff left Hover, the excavated perimeter constituting

2. The quarry operations were sublet by the prime contractor, the General Construction Company, to Edmund P. Erwen of Pasco, Washington, doing business as the Erwen Construction Company. Erwen actually performed the quarrying of the rock and the instant claim is also being brought in his (i. e., his estate's) behalf. However, the term "plaintiff" will be used as if the prime contractor performed such work.

3. 75 pounds minimum size 1,500 maximum, and 300–750 average. Only 10,400 tons of this largest sized rock, comprising only 4 percent of the total contract work, was required under this contract. The bulk of the contract requirement, 74 percent, consisted of a somewhat smaller size, i. e., an average of 250–500 pounds, but with the same minimum and maximum sizes.

the quarry face extended over the unusually large area of 1,350 feet. There was no reasonable prospect that further exploration would produce any substantially different results. In short, it turned out that the quarry was not a commercially operable one at all for the purposes of supplying any appreciable amount of rock for the project. Upon discovery of the situation and prior to abandoning the quarry, plaintiff made a timely request for an equitable adjustment under Article 4.

After plaintiff moved from Hover to the other "approved" quarry, known as Cold Springs, there was no further difficulty. This was an excellent quarry that easily supplied approximately 300,000 tons of rock with a waste factor of approximately 10 percent, and indeed plaintiff completed the entire project, even as enlarged by change orders, 2 months ahead of time.

Plaintiff's claim for an equitable adjustment was denied both by the contracting officer and the Corps of Engineers Board of Contract Appeals.

Certainly, encountering a condition in a "quarry"—let alone an "approved" quarry—which makes it not a usable quarry at all for the purposes involved, should, it seems clear, normally be considered an "unusual" one not "ordinarily encountered and generally recognized as inhering in" quarrying operations. Thus, it seems almost self-evident that plaintiff would be entitled to an equitable adjustment under this plain language of the above-quoted second part of Article 4. Cf. Tobin Quarries, Inc. v. United States, 84 F.Supp. 1021, 114 Ct.Cl. 286 (1949), where the claimant was held to be entitled to an equitable adjustment under Article 4 when it turned out that the quarry rock "was quite friable, and it proved impossible to get rock of the required size without excessive waste." (84 F.Supp. p. 1021, 114 Ct.Cl. p. 332)

The reasons why defendant denied plaintiff such an adjustment appear to lie primarily in the language of the first part of Article 4. Defendant contends that the conditions plaintiff encountered at Hover did not differ "materially from those indicated in the contract" and that, instead, an intelligent and knowledgeable reading and interpretation of the specifications and drawings would have disclosed these very conditions. This defense also carries over to the second part of the article, the provisions of which apply only to "unknown" physical conditions of the kind described. Defendant argues that plaintiff should have known of or reasonably anticipated the conditions encountered by what it contends the specifications and drawings clearly indicated, as well as by what should have been obvious had plaintiff made a careful investigation of the quarry sites and certain core borings therefrom which were available for inspection by bidders. Since plaintiff denies these contentions and, interpreting the specifications and drawings in quite different fashion, claims entitlement to an equitable adjustment on the basis of the first part of Article 4 as well as the second, and because defendant's defense seems to cut across both parts, it becomes necessary to examine the pertinent specifications and drawings to determine what was "indicated" therein and what was reasonably "knowable" or predictable therefrom, as well as from the site investigations and the core borings.

Defendant appears to place greatest reliance upon paragraph SW–5 of the specifications, subparagraph *a* of which stated that Hover was "an approved source of stone for work included under Schedule C" and that Cold Springs was such an approved source "for work included under Schedule B," but that if the contract was awarded under Schedule A "the Contractor may use either site or others as allowed by the specifications." The subparagraph went on to state, however, that in the latter event, which was the situation here, "the Government will not guarantee that" Hover "will produce satisfactory riprap for Schedule B work without excess fines or that" Cold Springs "will produce satisfactory riprap for Schedule C work without excess oversize." Subparagraph *b* added that if the

award went to two contractors, one to perform the Schedule B work and the other the Schedule C work, then "the contractor performing work under Schedule B will not be permitted to use Site A [Hover] without prior approval from the Schedule C contractor, and the Contractor performing work under Schedule C will not be permitted to use Site B [Cold Springs] without prior approval of the Schedule B Contractor." Defendant argues that the proper interpretation of these provisions of subparagraphs *a* and *b* is that Hover was not approved for Schedule B work, which contained the units calling for the larger sized rock.

These "Schedule" references were based upon, and had meaning only in view of the following background circumstances:

This project had been previously advertised for bids, but only two bids were submitted, one of them being plaintiff's. Both bids exceeded the Government's own estimate by impermissible amounts, necessitating their rejection and a readvertisement. This time defendant offered contractors the opportunity of bidding on less than the whole project. It did so by splitting the project into two parts, one called the "Schedule B" portion and the other the "Schedule C." Under the previous invitation, the project, although advertised under "One Single Schedule", had been divided into 12 units "for purposes of acceptance" of the work. The second invitation deleted one of these units, grouped 8 of the remaining 11 into a "Schedule B", and 3 into a "Schedule C", with bidders being permitted to submit bids limited to the separate schedules. Nevertheless, bidders could still bid upon the entire project, consisting of all the units grouped under "Schedule A."

However, splitting the project into two parts would necessarily produce problems with respect to the use of the two approved Government quarries. Under the original invitation and specifications, the successful contractor could use either quarry. Under the new plan, however, it was conceivable that the two successful contractors might want to use the same quarry, resulting in interference and operational problems.[4] It was obviously necessary, on a two Schedule basis, to assign Hover to one contractor, and Cold Springs to the other. Based on various factors, defendant had concluded, even prior to the first call for bids, that the Hover rock would break smaller than the Cold Springs rock. Defendant advised prospective bidders of this conclusion on a "Revetment Sources" contract drawing, referred to as Sheet 12, which was included in the first call for bids. This drawing depicted the layout of both quarries and graphically logged the results of the core borings from them. A "Note" thereon stated:

"Logs give general character of rock. The contractor is urged to examine cores at the District Office for detailed information. . In general rock at Quarry Site 'A' [Hover] will break smaller and contain more fine stone than at Quarry Site 'B' [Cold Springs]."

This drawing and note was also part of the second invitation and the contract entered into with plaintiff. Thus specification SW–5 made the quarry assignments on the basis of Hover being assigned to the part of the project requiring most of the smaller size rock, being Schedule C, and Cold Springs being assigned to the Schedule B work, which contained most of the larger size rock. However, even on a two Schedule basis,

---

4. Because of the need for emergency repair work on a part of the river bank adjacent to the line of the Union Pacific Railroad Company, the company had been permitted to take stone from the nearby Cold Springs quarry to make the repairs and was performing this work at the time of the call for bids. Thus, this possible interference problem also was present.

The first call for bids noted this. After stating that the Government would make available both quarries, the specifications provided (TP 1–04b(1)), that the Hover quarry would "be available without restrictions as to its use, but the use of" the Cold Springs quarry "must be coordinated with the Union Pacific Railroad Company."

either contractor could also use the other quarry provided he obtained the consent of the occupying contractor.

Obviously, to a Schedule A bidder—one bidding the entire job—these quarry assignments would be meaningless, for such a contractor was specifically permitted to use either quarry without restriction.[5]

Therefore, defendant's interpretation of this particular provision of the specifications as amounting to an approval of Hover only for the limited work under Schedule C, which contained the bulk of the small rock, and that it constituted a plain warning that Hover would not be satisfactory for the balance of the project and its substantial quantities of larger rock, does not comport with its obvious purpose. The part of this specification upon which defendant relies so heavily could reasonably have been read only as a quarry allocation in the event of separate contracts. Since plaintiff was bidding on the entire project (Schedule A) and since the specifications told it that if it were successful it "may use either site," it justifiably had no concern about such an allocation. The inapplicability to plaintiff's situation of these "Schedule B" and "Schedule C" references is made manifest by the fact that when the final contract was assembled and executed, these schedules were not even incorporated.

Nor, in light of other specification and drawing provisions, is the statement in SW–5 that "the Government will not guarantee that Site A [Hover] will produce satisfactory riprap for Schedule B work without excess fines or that Site B will produce satisfactory riprap for Schedule C work without excess oversize" an additional clear warning, as defendant contends, that Hover would turn out to be the kind of quarry it was. Contrary to defendant's contention, this was not, and could not have been, designed to give plaintiff a special and pointed warning

against Hover. The aforementioned Sheet 12, included in the original invitation, reiterated verbatim in the second invitation, and included as part of the contract drawings, made substantially the same statements about Hover. Thus SW–5 added nothing new in this respect. That Hover in all probability would not produce the large size rock "without excess fines" had also been discussed with plaintiff at a prebid conference in connection with the first invitation. The drafter of this specification made plain that the reference therein to the Hover "excess fines" did not constitute "anything new" since Sheet 12 already stated that Hover rock would "break smaller and contain more fine stone" than Cold Springs rock. And defendant's chief estimator testified that insofar as he was concerned, SW–5 did not "have a great deal of significance."

These references to excess fines could not fairly be taken to mean that for all practical purposes the quarry could not, as it turned out, be used at all for the larger sized rock. It rationally meant that instead of the normal amount of quarry waste for the type of operation herein involved, i. e., approximately 10 percent, a contractor might expect 15 or 20 percent, or perhaps even somewhat more. It could hardly mean, however, to cover the unusual amount of over 60 percent for the relatively small amount of good large sized rock that was there and then its almost complete disappearance.

Similarly, it is not understood how the provisions in SW–5b lend support to defendant's position that the specification withdrew approval of Hover as a source of rock for Schedule B work. All that subparagraph did, in the event of a two contract situation, was to require approval by the occupying quarry operator before the other operator would be permitted to use his quarry. With such approval, either or both quarries could be used by each contractor. To imply from

---

5. Except that the railroad company was still entitled to continue with its operations at Cold Springs, referred to in fn. 4. Spec. par. TP 1–04. However, this specification went on to state that use of Cold Springs "by the railroad company for emergency rock will be limited to a small area  *  *  *."

this provision, as defendant urges, a withdrawal of the prior Government approval of Hover for Schedule B work on the speculation that it is unlikely that such an occupying contractor approval would be given is not justified.

Going beyond SW–5 upon which defendant places chief reliance, and examining other pertinent parts of the specifications against which SW–5 is also to be interpreted, there can be little doubt that the subsurface condition which plaintiff encountered "differed materially from those indicated in the contract."

Specification TP [Technical Provisions] 1–04b(1), headed *"Material—Riprap-Sources"*, flatly stated that "the Government will make available to the Contractor, as *approved* quarry sites: Hover Quarry-Site 'A' and Cold Springs Quarry-Site 'B', as shown on the plans and as hereinbefore specified." (Emphasis supplied.) That these approvals were based upon at least some measure of Government satisfaction with the quality of the quarries is "indicated" by the succeeding statement in the same specification that "these sites have been explored by core drilling at locations shown on the plans." The Hover site was made "available without restrictions as to its use."[6] Similarly, Government testing of the rock from these quarries prior to their approval was indicated by the statement in subparagraph (3) of this specification, headed "Quality", that defendant could employ "suitable tests and service records * * * to determine the acceptability" of the quality of the stone, and that: "In the event suitable test reports and service records that are satisfactory to the Contracting Officer are not available, *as in the case of newly operated or opened sources,* such material" was subject "to such examination and tests as are necessary to determine its acceptability for use." (Emphasis supplied.) The clear inference was that testing had already been accomplished at the two approved quarries since they had already

been subjected at least to core borings. Contractors could not use quarry sources other than Hover or Cold Springs without the approval of the contracting officer (TP 1–04a). Moreover, Specification SC [Special Conditions]–6, *"Physical Data"*, stated: "The physical conditions indicated on the drawings and in the specifications are the result of site investigations by surveys, core borings and reconnaissance," and SC–24, *"Material Sources"*, further stated: "Government-owned sources of riprap for use in the various phases of work under this contract are shown on the drawings. * * * The Government has made extensive investigations of riprap sources indicated on the drawings and the records of these investigations may be examined by the bidders."

Of particular importance is the above-mentioned contract drawing Sheet 12. This drawing cannot be dismissed with the statement that it gave, as set forth in the above-quoted note, only "general" information, with the contractor being obliged to assume complete responsibility based upon its own examination of the core borings and the site. In the language of Article 4, it "indicated" more than that. Defendant had taken five core borings from Hover and two from Cold Springs, and that drawing, after showing the layout of each quarry site, set forth logs of these borings. These logs represented the Government geologist's evaluation of the cores. As to each core at Hover, the logs referred to the first 13–15 feet of rock as being composed of hard basalt. Two referred to the rock as "sound." While all also made some reference to fractures, they were not of a character to nullify the references to the rock as being "hard" and "sound." Three logs followed the "hard" and "sound" descriptions with the statement "with some fractured zones," one merely stated "with fractured zones" and the fifth stated "fractured." Thus, despite fractured zones or areas, the indi-

---

6. The use of Cold Springs was subject to the emergency operations being conducted by the railroad. Also, the contrac-

tor was required under this specification "to work" Cold Springs for the full depth of suitable rock.

cations were that there were also large areas of hard, sound, basalt. One of the two Cold Springs logs also described the core as being "highly fractured" at both the top and the bottom of the quarry face. No reference to the rock's being "sound" is contained on either Cold Springs log, although from past and current operations, Cold Springs was known to be an excellent quarry. Certainly, the core borings at Hover, as interpreted by the Government's own geologist, and as set forth on the contract drawing, more than "indicated" that Hover was a reasonably good commercial quarry for the purposes of this project, although, as the note on the sheet stated, a greater than normal allowance for fines or waste should be made if this quarry was to be used.

Such general caveatory language of other parts of the specifications upon which defendant relies as "Approval of a source shall not be construed as approval of all material from that source" (Par. SC–24); "the Government does not guarantee that all materials from these sources will meet the size or durability requirements of these specifications" (Par. TP 1–04a); and "Unsound rock encountered in approved quarries will be rejected for use as riprap" (Par. TP 1–04b(3)), cannot serve to deprive Article 4 of all force and effect or to negative completely the favorable "indications" inherent in the other parts of the contract specifications and drawings. No one could logically contend that approval of a quarry constituted a guarantee of perfection of the quarry and acceptability of 100 percent of the rock therefrom. But this cannot mean that if, after considerable contractor expense and effort, an "approved" quarry produces an insubstantial amount of satisfactory rock, defendant has no obligation under Article 4 to do anything about it because, under the aforementioned provisions, it had no obligation to accept any rock at all from the quarry.

Indeed, defendant does actually go so far as to contend that it was up to plaintiff to deliver acceptable rock,

that defendant had no responsibilities whatsoever in the matter, that defendant was simply making its quarries available to plaintiff, and that plaintiff could use them, or, with the contracting officer's permission, any other quarry sources it desired. Thus, says defendant, "approval" meant nothing more than permission to use, without any obligation on defendant's part as to what the contractor would find. In this manner, defendant would in effect read Article 4 out of the contract entirely insofar as quarry sources or operations are concerned. Manifestly, this would not be proper. Loftis v. United States, 76 F.Supp. 816, 110 Ct.Cl. 551, 628 (1948). The quarry sources were an integral part of the contract, there were no known suitable quarries in this part of the country other than the two Government-owned ones, the Government went to considerable trouble to take core borings from both of them which were made available to bidders, it made logs of the borings which were incorporated in Sheet 12 and it made, as shown, various other statements about quarry sources. The very heart of this undertaking was the obtaining of suitable rock in a reasonably economical manner from a satisfactory quarry. It would be illogical to conclude that Article 4, specifically addressed to subsurface conditions, was inapplicable to the only part of the project that involved such operations. The very purpose of Article 4 is to prevent bidders from adding high contingency factors to protect themselves against unusual conditions discovered while excavating, for obviously no one can ever know with certainty what will be found during subsurface operations. The article is thus expressly designed to take at least some of the gamble out of subsurface operations. Defendant's attempt to divest itself of all contract responsibility with respect to these subsurface quarry conditions and to throw the entire risk thereof upon the contractor, including even the risk of total quarry failure, cannot, in view of the retention of Article 4 in the contract, be sustained. As the court stated in Loftis

v. United States, supra, where defendant too, by reason of a specification provision, took the position that the claimant "assumed the risk of encountering unstable subsurface conditions * * *", this "argument of defendant might be justified if we could ignore the fact that the contract, and of necessity the specifications, also contained Article 4. The purpose of specifications and drawings is to supplement the formal contract by delineating the details of the work to be performed thereunder and not to void an express provision written into the contract." (76 F.Supp. p. 825, 110 Ct.Cl. pp. 627–628.)

Nor can plaintiff's prebid examination of the core borings and the sites fairly be subjected to the harsh criticism defendant makes concerning the adequacy thereof. Both examinations were made with reasonable care. And plaintiff was the only contractor to show up at a prebid conference arranged by defendant. Although trained geologists might debate interminably about the matter, insofar as an examination by a reasonably experienced and intelligent contractor-layman is concerned, there was no clear or obvious indication in the physical appearance of the Hover cores that the rock would act as it subsequently· did. Core cracks and fractures frequently result from the extraction process itself and it is often difficult to tell when a crack is caused mechanically through extraction or whether it is inherent in the rock structure. In this respect there was no readily discernible difference between the Hover and Cold Springs cores. Indeed, even a competent geologist might have missed the difficult-to-detect characteristics in the cores upon which defendant now relies.

Plaintiff also inspected the Hover Quarry itself several times. There were two railroad cuts at or near this quarry, the line having been relocated in recent years. The old cut exposure, which was within the confines of the quarry and would constitute the likely area for the development of the quarry face, indicated some good rock as well as some of poorer quality. The new cut, which lay just outside the quarry limits but which could reasonably be considered as representative of the ·rock within the closely adjoining quarry area, indicated the presence of columns of good, large rock. It was known that when the new cut was made, large rock for riprap had been taken therefrom, some of it of such size as to require secondary breakage. This was an important factor in causing the Government itself to approve the quarry in the first place. Explosive and construction experts, experienced in quarry and rock operations, accompanied plaintiff in appraising Hover. They also felt it would be satisfactory. Here again, although geologists might debate the significance of certain visual signs in the cuts, to a reasonably competent contractor-layman these cuts gave no plain warning, as defendant contends, that a contractor should stay away from Hover. . Indeed, as shown, defendant's own approval of Hover was in substantial part based on the favorable showings of rock in the cuts and the knowledge of the large riprap that had come from the new cut.

■ The specifications, drawings, core borings and site investigation considered, plaintiff's selection of the Hover site was not, as defendant maintains, an imprudent foolhardy act. Indeed, on the basis of what the Government knew and said about Hover, it seems safe to conclude that it was as surprised as plaintiff was that Hover turned out as it did. The record does not indicate that defendant made any kind of special tests of the Hover rock or that it had some peculiar information about Hover which it did not disclose or make available· to bidders. At least before the Appeals Board, defendant's witnesses testified that plaintiff was wholly justified in abandoning Hover and that, indeed, plaintiff had no practical alternative. This is, of course, consistent with its contention that plaintiff never should have gone in there in the first place. But if defendant was indeed not surprised, and if in fact it "knew" all along, as it now seems to contend,

that Hover would be the kind of a quarry it turned out to be, then certainly it never should have "approved" it for contractor use in the first place. In view of the encouraging statements it did make about Hover, defendant's alleged knowledge would raise delicate and serious questions of misrepresentation or liability based on failure to disclose pertinent information. Potashnick v. United States, 105 F.Supp. 837, 123 Ct.Cl. 197 (1952); Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963). However, defendant's contention based on its "knowledge" is construed to refer only to what it contends should have been the proper interpretation of the specifications, the cores and the railroad cuts, since, as stated, it does not appear that it had any pertinent data or reports which it failed to disclose. Under the circumstances, the situation must be considered comparable to Tobin Quarries, Inc. v. United States, supra, where it was also held that "Neither party expected that, to get proper rock from the" source there involved, "great quantities of material would have to be picked over, most of which would have to be disposed of as waste" (84 F.Supp. p. 333, 114 Ct.Cl. p. 1022). Consequently, plaintiff's charges of intentional misrepresentation or deliberate fraud cannot be sustained. In the same way, however, since there were no other reports, data, or information which defendant had and which plaintiff was invited to inspect but nevertheless failed to do so, the case of Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963), upon which defendant relies, is not in point. And for another important reason is that case distinguishable. As the court there pointedly noted: "Significantly, the contract contained no clause relating to changed sub-surface conditions." (312 F.2d p. 412, 160 Ct.Cl. p. 363.)

The conclusion that plaintiff did not act unreasonably in selecting Hover is not to deny that a contractor also might well have reasonably concluded that it would be better, considering all factors, to choose Cold Springs. As a result of prior work there, it was a proved quarry. And, despite the substantially larger mobilization costs involved, since so much of the required rock was of the larger size a contractor might well have elected to wrestle with the "excess oversize" (Spec. SW–5) and secondary breakage problem than with the "excess fines", and consequently larger waste, problem at Hover.

But by the same token, Hover admittedly had certain obvious advantages over Cold Springs. A truck haul of approximately 1½ miles from the Cold Springs quarry face to the barge-loading point on the river would be necessary. For the truck route, easements would have to be obtained from property owners. And after the trucks arrived at the riverbank, there was no site in the area for the location of a simple and inexpensive type of barge-loading facility. The natural elevation of the riverbank in this locality exceeded 30 feet above the water, necessitating expensive loading facilities. And to reach water sufficiently deep to accommodate the barges on which the rock was to be loaded, a causeway would have to be constructed from the mainland to an adjoining island where the barge-loading facilities would have to be constructed. Hover presented no such difficulties. It was not only located immediately adjacent to the river, but at a point where there was deep water available for close to the bank barge-loading operations and where, also, an inexpensive type of barge-loading facility could be constructed since the riverbank was only 7 feet above the water. And, since the rock would in all probability break closer to the specification sizes, the secondary breakage operation would be reduced. It seems clear that, considering all aspects of the situation, it was entirely reasonable for a contractor to choose Hover despite the "excess fines" problem. An allowance for "excess fines" did not mean that there would still not be sufficient good rock of all project sizes. Of course, it is here too, as is true in innumerable situations, essentially a matter of degree.

Obviously plaintiff could not claim compensation for "excess fines" in amounts reasonably above normal quarry operations. But "excess fines" cannot fairly be construed to cover an enormous percentage of material handled, even a total lack of rock, although that too would indeed literally constitute "excess" fines.

Defendant further contends that a truly efficient operation here for a Schedule A contractor would, in view of what the specifications and drawings said about "excess oversize" at Cold Springs and "excess fines" at Hover, have been to use Hover for the small sized rock, and Cold Springs for the large, thus resulting in a two-quarry operation. Defendant says plaintiff's real trouble arose from attempting to produce the large sized rock from Hover, since the required order of operations called for plaintiff's first working on units requiring a substantial amount of the larger sized rock and which plaintiff was still working on when it abandoned Hover. Hover was and would have been, defendant says, entirely satisfactory for the small sized riprap and "random" rock, for which quarry waste was usable as a source.

Here again, although a two-quarry operation may conceivably have been economically possible and a plausible case made for it, it would not, nevertheless, appear to have been unreasonable for a contractor to decide against the very large costs of mobilizing and operating two quarries. After all, a contractor is understandably interested in as economical an operation as possible. The test is not necessarily what another contractor might, with reason, have defensibly done, and whether he might not, in the long run, have come out as well or even ahead of a one-quarry operator. The real test is whether, in light of everything the contract said about Hover, and all the other facts and circumstances, including the core borings and site investigations, plaintiff acted wholly unreasonably, as

defendant maintains, in choosing Hover as the sole source of the project rock. It seems clear that it cannot fairly be concluded that it did.

Nor can significance be attached to the various criticisms defendant makes of plaintiff's operating procedures at Hover, such as its alleged improper use of a grizzly [7] and its alleged failure to strip the overburden, thereby unduly contributing to the waste factor. Insofar as such criticism implies that Hover was a good quarry and would have supplied the required project rock had plaintiff only operated correctly, its position is quite inconsistent with its contention that no prudent Schedule A contractor would have selected Hover at all. It is also inconsistent with its position before the Board that plaintiff was justified in abandoning Hover and that it had no practical alternative. Secondly, while there always can be, of course, legitimate differences of opinion concerning what constitutes the best operating procedures under a given set of conditions, nevertheless all of plaintiff's alleged operating inefficiencies seemingly disappeared at Cold Springs. For there, with the same management, equipment, and crews, it is undisputed that no further troubles were encountered, that production of satisfactory project rock proceeded in a steady and abundant stream, and that indeed, plaintiff was efficient enough to complete the project, even as subsequently enlarged, 2 months ahead of time. The evidence shows that plaintiff did erect and use a grizzly at Hover, that no complaint was made at the time that such use was inefficient or improper, and that where there was overburden on a solid rock base which could, as a practical operating matter, be stripped, it was. There was no requirement that plaintiff use a grizzly to produce large riprap. Specification TP 1–06a provided that "the required stone sizes shall be obtained by selective loading at the quarry, use

---

7. A grizzly is a kind of screen made of railroad ties. It was used at Hover to separate the dirt from the small sized rock which was stockpiled for later use

as random rock. Plaintiff abandoned Hover leaving a substantial amount of such rock in the stockpile.

of a grizzly if necessary, at Hover Quarry, or other method or combinations of methods as might be necessary." Plaintiff used the commonly employed selective loading method, and there is no substantial showing that this was under the circumstances improper.

Defendant further contends that even if the contract did indicate that the rock at Hover was hard and "sound", the rock in fact was of such character because there is no disagreement that the 37,500 tons of the larger sized rock that plaintiff was able to produce out of Hover and place as riprap was sound in the sense that it performed satisfactorily as riprap once it was successfully placed on the riverbank. But soundness in the context here involved obviously means soundness from the point of view of standing up under the normal handling incident to the operation of a commercial quarry.

In all, defendant accepted approximately 50,000 tons of material from Hover. However, of this amount 25 percent was random material which had no specific gradation requirements and constituted riprap residue. Fifty thousand to sixty thousand tons of material was disposed of as waste. Since 25 percent of the 50,000 tons of pay rock in itself constituted quarry waste that was permitted to be used for project purposes, only 37,500 tons of real riprap came out of Hover. Thus, of approximately 100,000 tons of material handled at Hover, the percentage of recovery of good rock was only around 37 percent, or an enormous waste factor of over 60 percent. On the first invitation, where the bidding was only on the basis of one Schedule for the entire project, and where, as shown, the information regarding Hover was substantially the same as on the second invitation, defendant's estimators compiled their cost estimate on the basis of obtaining 37,500 tons of riprap from Hover for use on units which were subsequently included in Schedule B in the second invitation, and, in connection therewith, used a waste factor of only 15 percent (as against 20 percent calculated by plaintiff). Thus, it turns out that defendant itself, when in a position comparable to plaintiff as a one Schedule contractor, used Hover as a source for some of the larger sized rock which defendant now says no prudent contractor should have used.[8]

It is further argued that the Board's decision denying recovery is entitled to finality. To the extent that this dispute properly falls within the Disputes clause of this contract, there was no timely objection to a trial de novo based upon the theory of United States v. Carlo Bianchi & Co., Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Accordingly, the evidence admitted at such trial may be considered by the court. Stein Bros. Mfg. Co. v. United States, Ct.Cl.1963, 337 F.2d 861 (1963); WPC Enterprises v. United States, 163 Ct.Cl. 1, 323 F.2d 874 (1963). Moreover, the Board's decision is almost wholly concerned with an analysis of the contract specifications and drawings to ascertain whether, in the language of Article 4, the conditions at the site differed "materially from those indicated in the contract." The Board apparently gave almost conclusive effect to Specification SW–5, evidently feeling that, properly interpreted, it gave contractors a clear warning not to use Hover for the large riprap. Thus, based as it essentially is on an interpretation of the contract, a question of law, its decision lacks finality. Simply because an "equitable adjustment" is involved does not automatically project the case into the category of that kind of contract dispute to which administrative finality attaches.

8. In all, defendant's estimate was for approximately 100,000 tons of rock to come from Hover, around 37,500 tons to constitute rock of 75 pounds minimum and 1,500 pounds maximum size, with an average size of 250–500 pounds, and the balance to constitute rock of 25 pounds minimum and 400 pounds maximum, with average size of 80–150 pounds. The larger size constituted the great bulk of the rock to be placed on this contract.

The fundamental issue is the basic nature of the controversy. When a decision concerning the allowability of an equitable adjustment turns on the proper interpretation of contract provisions, then what is ultimately involved is a question of law. John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 132 Ct.Cl. 645, 656–7 (1955); Guyler v. United States, 314 F.2d 506, 161 Ct.Cl. 159 (1963); W. H. Edwards Eng'r. Corp. v. United States, 161 Ct.Cl. 322 (1963); WPC Enterprises, Inc. v. United States, supra; Wingate Construction Co. v. United States, Ct.Cl. No. 394–60, decided January 24, 1964.

■ In addition, the Board was, unfortunately, the recipient of important testimony offered by defendant which proved to be quite erroneous. To substantiate its contention that no prudent contractor would, under these specifications and drawings, have chosen Hover as a quarry from which to obtain the larger sized riprap, one of defendant's chief witnesses before the Board testified that the Government's own cost estimate on the first invitation, the one Schedule invitation, was based wholly on Cold Springs. However, as a result of discovery proceedings before this court, it turned out that the Government estimate in question was indeed based upon the production of 37,500 tons of such riprap from Hover and with only a 15 percent waste factor. Defendant's witness who testified erroneously before the Board explained before this court that his Board testimony constituted an honest and unintentional error, and there is no reason whatsoever to doubt this. On the other hand, who can tell what difference the important fact involved might have made in the Board's consideration of the case? Cf. Stein Bros. Mfg. Co. v. United States, supra, where, as a result of discovery proceedings in this court, important memoranda were disclosed of which the Appeals Board was not apprised, and which memoranda went far to rebut the position of the Government's witnesses before the Board as to the proper interpretation of the contract. Finality was, consequently, not accorded to the Board decision.

Further, an important contention in the Government's case before the Board was that SW–5, in the changed wording form incident to the second invitation for bids splitting the project into two parts, and issued, as it was, just 8 days prior to the opening of bids as part of an Addendum, constituted a special warning against Hover. The Government's testimony was that prior to this revised SW–5, Hover was approved without qualification as a quarry from which bidders could reasonably expect to fulfill their entire contract requirements. However, as already pointed out, in the further testimony before this court defendant's own witnesses, including the drafter of the provision, conceded that the provision added "nothing new", and that the second set of specifications and drawings involved in the contract as executed were in all material respects substantially the same as the first in the message they conveyed to contractors. If this interpretation testimony is accepted, then defendant's admission before the Board to the effect that Hover was fully approved as a source for all rock necessarily follows. Perhaps in this confusion on defendant's own part as to the true interpretation of its own specifications, the case should simply be disposed of on the familiar principle of resolving ambiguities against the author. As the court stated in Loftis v. United States, supra, in answer to defendant's contention that a certain specification provision should, despite Article 4, "be interpreted * * * as a warning or the expression of an opinion that unstable and unusual subsurface conditions existed", if "the person who prepared this specification so intended, he succeeded in using language that was so indefinite and misleading as to conceal his intention." (76 F.Supp. p. 826, 110 Ct. Cl. p. 629.) [9]

9. The bid invitation contained a provision that if a revision or amendment was of such a nature as to require material changes in prices bid, the opening date

Again, as to the alleged "warnings" which defendant supposedly gave to plaintiff about Hover, the contracting officer stressed in his findings that plaintiff orally received from a Government representative specific warning and advice about the unsatisfactory nature of Hover at the prebid conference of April 5, 1956, and the inspection of the cores immediately thereafter. Defendant's testimony before the Board supported the contracting officer's version. The Board's opinion emphasizes this finding (pp. 8–9). A picture was seemingly created of a foolhardy contractor who insisted on a course of action despite the plain warnings and advice of knowledgeable Government personnel. At the trial in this court, however, it was made plain by the official involved that he gave no such special oral warnings or advice against the use of Hover and that the little that was said about the quarries at the prebid conference amounted to nothing more than a reiteration of what the specifications and drawings already indicated. He conceded the possible erroneous connotations flowing from the use by the contracting officer and the Board of the terms "warning" and "advice."

And finally, as pointed out, defendant's witnesses before the Board had no criticism of plaintiff's abandonment of Hover. Instead, they unanimously agreed that if plaintiff were to complete the contract in any economical or timely fashion, it had no practical alternative and that the decision to abandon Hover was sound. The Board took special note of this by saying (p. 19): "Appellant's original claim letter charges that Hover will not produce rock of the quantity and size required by the (entire) contract, *except at a cost which is unreasonable and prohibitive.* With this, the Government would undoubtedly agree", and that: "Government witnesses agree that the Hover site was not suitable for the production of the total riprap requirements, and that appellant was prudent in moving to the Cold Springs site." (p. 6) At the trial in this court, however, the position was taken that, including the rock below water level, there was sufficient rock of all sizes at Hover to complete the contract and that plaintiff's real trouble lay in the alleged operational inefficiencies previously discussed, and particularly plaintiff's alleged ineffective use of the grizzly.[10] And by this, defendant must mean that

could be postponed so as to enable bidders to revise their bids. If this addendum issued so close to the date of the bid opening was of such importance as to withdraw approval of a large part of the work from one of the previously unqualifiedly approved quarries, as defendant contended before the Board, it was certainly of such importance as to have warranted a postponement of the bid opening so as to permit bidders who were contemplating using Hover for all of the contract work to recalculate their bids. The fact that this was not done indicates that SW–5 at the time it was issued was not considered by defendant to have the major importance testified to before the Board.

10. Defendant's position with respect to the apparently sound basalt rock below the water table, is confusing. The then Chief of the District's Soils Section, who had spent considerable time in searching for quarry sources and who had located Cold Springs and Hover for use on this project, and who was also the author of the pertinent specifications herein involved, testified at the trial that it would have been practical to operate in the basalt rock below the water level and that there would not have been much of a water problem in connection therewith. He further testified, however, that Erwen was not properly equipped either to remove the covering red layer of vesicular rock or to pump the small amount of seepage he would have encountered (Tr., pp. 308–309). Evidently this testimony was given in support of the thesis that Hover was a perfectly good quarry that would have provided all of the project rock had plaintiff only operated correctly or been adequately equipped. In its requested findings, however, defendant, in support of its position that no prudent contractor should have selected Hover, points out that such sound basalt rock could not reasonably have been relied on because it was below the water table, which would have made "very difficult any practicable production of riprap from this lower layer of rock." (p. 27)

it was possible to complete the contract at Hover at a cost which was reasonable and not prohibitive—a position contrary to that taken before the Board—for surely it cannot be argued that, despite Article 4, a contractor would be expected to stay at Hover even if he were to go bankrupt while hunting for and culling out, with an enormous waste factor, sufficient, suitable rock.

Considering the erroneous testimony presented to the Board, and the various shifts in defendant's positions from those taken before the Board, the conclusion is compelled that, as the court stated in John A. Johnson Contracting Corp. v. United States, supra, "[w]hatever justification there may have been for the Board's decision upon the basis of the facts known to it, we feel certain that if it had had the evidence which we have, and which was in the possession of the Government and unknown to the plaintiff, it would have remanded the case to the contracting officer for a decision properly arrived at." (132 F.Supp. p. 706, 132 Ct.Cl. 661) Consequently the situation here would seem to be comparable to that in WPC Enterprises, Inc. v. United States, supra, where the court held: "On consideration of the record before the Board and in this court, we have concluded that, even if the Board's findings are fully treated as factual, they are not final under the [Wunderlich] Act because they lack substantial support in the record as a whole." (323 F.2d p. 878.)

There is a final problem. Defendant contends that this suit is in effect brought for the benefit of the quarry subcontractor, but that this subcontractor, by his own admissions from the witness stand, conceded lack of liability by the prime contractor to him. Therefore, it is argued, the suit should, on the authority of Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944), be dismissed for failure of the plaintiff, the prime contractor, to prove any damage.

The contention cannot be accepted. There is nothing in the subcontract "expressly negating plaintiff's liability to" the subcontractor "for the claims being asserted", nor is there any release executed by the subcontractor containing any "express exculpatory clause relating" thereto. J. L. Simmons Company, Inc. v. United States, 304 F.2d 886, 890, 158 Ct.Cl. 393, 399 (1962). Expressions of opinion by a subcontractor-layman as to legal rights he thinks he has or does not have are immaterial. McCormick, Evidence § 241 (1954).

Based on all of the above considerations, plaintiff is entitled to an equitable adjustment under both parts of the Changed Conditions provision of the contract. The subsurface physical conditions at the site did differ materially from those indicated in the contract, and unknown physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in quarrying operations, were encountered.

As to the proper amount of such adjustment, which plaintiff claims should be $184,391.61, and which Article 4 speaks of in terms of "an increase or decrease in the cost of * * * performance of this contract", it would appear proper to allow plaintiff the following items in the following amounts: (a) the additional costs incurred at Hover attributable to the greatly reduced output during the limited time it was producing as compared with the tonnage it reasonably planned to produce during such period—$10,676.91; (b) the cost of moving from Hover to Cold Springs, an expense it would not have incurred had it not been necessary to abandon Hover—$682.20; (c) the cost of setting up its facilities at Cold Springs, also an extra cost it would not have incurred had it not been necessary to abandon Hover (no claim is made for the setting up expense at Hover)—$42,404.89; (d) the excess cost of final moving out from Cold Springs to the home office at Pasco, Washington, as compared with what such costs would have been from Hover, plus

the final site cleanup at Cold Springs (here too plaintiff makes no claim for the final site cleanup at Hover)—$2,678.17; (e) additional supervisory expense resulting from the necessity of incurring dual expenses of that nature for 9 weeks prior to abandoning Hover and while mobilizing Cold Springs—$1,350; and increased industrial insurance costs due to the higher rates in Oregon, where Cold Springs was located, than the similar rates in Washington, where Hover was located—$4,370.68. The allowance of these items constitutes "the difference between what it cost it to do the work and what it would have cost it if the unforeseen conditions had not been encountered." Tobin Quarries v. United States, supra, 84 F.Supp. p. 1023, 114 Ct.Cl. p. 334. These amounts, totaling $62,162.85 to which are added overhead and profit at appropriate rates, result in a total amount of $71,509.04. The details and bases for the computation of these amounts are set forth in findings 59–68.

The largest item of plaintiff's claim, consisting of alleged additional operating costs at Cold Springs in the amount of $83,766.44 is disallowed for failure of proof. While plaintiff did operate with more manpower and equipment at Cold Springs than what would seemingly have been necessary to produce the originally planned production at Hover (1,200 tons per day), there is no showing that this was not a management operating decision and choice from which great benefits flowed. With the increased manpower, some of it overtime, and the greater amount of equipment devoted to the Cold Springs operation, plaintiff poured out rock at an average daily production rate of almost 1,600 tons. On one day production went as high as approximately 2,000 tons. The result was that plaintiff completed the job, even as enlarged by change orders, 2 months ahead of time. This, of course, necessarily greatly benefited plaintiff. Under the circumstances, it is not proved that the operating labor and equipment costs in excess of what

they would have been at Hover to produce the planned 1,200 tons per day, was a true, damaging, "excess" cost. For all that appears, plaintiff may well have produced only 1,200 tons per day at Cold Springs with substantially the same manpower and equipment as it had planned to use at Hover.

Consequently, it is recommended that judgment be entered for plaintiff in the sum of $71,509.04.