**UNITED STATES of America,
Plaintiff,**

v.

**AMTRACO COMMODITY CORPORATION, Defendant.**

**No. 74 Civ. 1562–CLB.**

United States District Court,
S. D. New York.

Dec. 30, 1974.

Paul J. Curran, U. S. Atty., by Charles Franklin Richter, Asst. U. S. Atty., New York City, for plaintiff.

Shaw, Pittman, Potts & Trowbridge by William Bradford Reynolds, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintif here sues for breach of contract to recover price adjustments allegedly due the Commodity Credit Corporation ("CCC") under four contracts with the defendant, Amtraco Commodity Corporation ("Amtraco"). These contracts govern four purchases by Amtraco from CCC of butter for export re-sale. Amtraco moved to dismiss the complaint on the ground that the Government had failed to exhaust the contracts' administrative remedies.

On November 24, 1971, CCC and Amtraco entered into contract number MP (FS) 49079, whereby Amtraco purchased for export 321,118 pounds of butter at 50.955 cents per pound. On December 14, 1971, contract number MP (FS) 49092 was entered into for 1,584,762 pounds of butter, of which 984,769 pounds were provided at 52.8773 cents per pound. A third contract, number MP (FS) 49093, was entered into on December 23, 1971, which provided for the sale for export of 1,701,116 pounds of butter; 599,760 pounds were provided at 52.0765 cents per pound. These contracts permitted Amtraco to purchase the offered butter and export an equivalent amount of butter within 90 days. The contracts provided further that if Amtraco certified that its contract with the foreign importer specified butter having 82% milkfat content, the volume of such butter for export would be adjusted by 1.025 to satisfy the terms of the CCC sales contracts; Amtraco availed itself of this provision.

The contracts provided for a price adjustment if Amtraco failed to export the butter or if it was re-imported. On November 15, 1972, all of the butter under contract number MP (FS) 49079 re-entered the United States. The Government alleges in its complaint that portions of the butter under the other 1971 contracts re-entered the United States on November 15 and December 7, 1972. On March 1, 1973, Amtraco paid the Government $270,000.00 as a price adjustment. The first cause of action seeks an additional payment of $14,114.48, plus interest of 6% per annum from March 7, 1973.

The terms of the 1972 contract, entered into on January 6, 1972, provided for Amtraco's purchase for export of 1,000,216 pounds of butter at 52.7954 cents per pound. Section 10(B) of Department of Agriculture Announcement MP–23, dated January 11, 1968, which was made part of each of the four contracts, provided:

"*Export Period and Products*: Within 90 days after date of contract, or within such extension of time as may be granted by the Director of the Minneapolis ASCA Commodity Office upon a determination by CCC that the

buyer has been, or will be, delayed, in exporting the products by causes without the fault or negligence of the buyer shall export, or cause to be exported [the butter covered by the contract]."

In accordance with this provision, Amtraco applied for and received five extensions of time, in all extending until December 21, 1972 the time in which Amtraco had to export the butter. On December 15, 1972, Amtraco requested an additional 180 days within which to export its butter. On December 18, 1972 this request was denied and, subsequently, reconsideration was denied. As its second cause of action, the Government seeks $176,678.01 as a price adjustment for Amtraco's failure to export, plus interest at 6% per annum from January 6, 1972.

Amtraco bases its motion on Section 16 of MP-23, which contains a standard disputes provision reading in relevant part as follows:

"A. Any dispute concerning a question of fact arising out of this contract, including any breach thereof, which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the buyer. The decision of the contracting officer shall be final and conclusive unless within 30 days from the date of receipt of such copy, the buyer mails or otherwise furnishes a written appeal to the Contract Disputes Board for CCC. The decision of the Contract Disputes Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence.

\*    \*    \*    \*    \*    \*

B. This 'Disputes' provision does not preclude consideration of law questions in connection with decisions provided for in the above paragraph: *Provided, however,* That nothing in the contract shall be construed as making final the decision of any administrative official, representative or board on a question of law."

The four contracts were signed by George N. Lynch of the Minneapolis office of the Agricultural Stabilization and Conservation Service of the Department of Agriculture ("Minneapolis office") on behalf of CCC. Amtraco's motion is directed at the fact that this matter was not submitted in the first instance to Lynch, as the contracting officer, for adjustment.

The controversy regarding the 1971 contracts began in December 1972 when Amtraco was informed that CCC considered a price adjustment necessary because the butter had been re-imported and Amtraco was advised of the amounts due by invoices 8848, 8849 and 8850. Amtraco responded to the invoices with a request for more specific computations of the price adjustment. This request was addressed to John C. Ebert, Deputy Director of the Minneapolis office. In January, February and March 1973, there followed an exchange of communications between Joseph S. Silver, Hayden J. Bennett and Ricardo Jove on behalf of Amtraco and Director Donald L. Gillis, Acting Director L. J. Arent and Deputy Director Ebert, all of the Minneapolis office, on behalf of CCC. (Exhibit 1 to Affidavit of Mr. Donald L. Gillis, sworn to September 25, 1974).

In the exchange of correspondence, the points of controversy were crystallized. CCC asserted that Amtraco was liable for interest from the date of the contract on contracts MP (FS) 49079 and 49092, represented by invoices 8849 and 8848, respectively, in accordance with §§ 12D and 12A1 of MP-23; and for interest from the date of re-entry on contract MP (FS) 49093, represented by invoice 8850, pursuant to § 12B of MP-23. Amtraco's contention was that interest should be computed under each of the contracts from the date on which the butter re-entered the United States. A further disagreement ensued concerning the computation of the price differential for the export of 82% butter fat

quality. CCC viewed this matter as being governed by § 10 of MP–23; Amtraco contended that § 12 governing the price adjustment for failure to export did not make allowance for this differential.

Amtraco asserts that these matters should have been submitted to Lynch as the contracting officer. Section 16A requires that "[a]ny dispute concerning a *question of fact* arising out of this contract . . . shall be decided by the contracting officer, who shall reduce his decision to writing. . . ." Emphasis added.) Section 16B provides that the contracting officer is not precluded from hearing questions of law, but that administrative decisions on such questions are not final.

■ The disputes clause required only that questions of fact be submitted to the contracting officer in the first instance. This provision did not require that questions of law be submitted for his adjudication. 42nd Street Fotoshop, Inc. v. United States, 137 F.Supp. 313 (S.D.N.Y.1955). The distinction made between questions of fact and questions of law was a term of the contract and, as such, that distinction should be observed. *Cf.* Zidell Explorations, Inc. v. United States, 427 F.2d 735, 192 Ct.Cl. 331 (1970). Amtraco did not dispute the fact that the butter had re-entered the United States, nor the date of its re-entry. Its objections were confined to CCC's computation of the price adjustments and the application of the provisions governing interest.

■■ The controversy over the 1971 contracts emerged from conflicting interpretations of the provisions of those contracts. The interpretation of a contract raises questions of law. See John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 132 Ct.Cl. 645 (1955); Rust Engineering Co. v. United States, 86 Ct.Cl. 461 (1938). The question of the Government's entitlement to interest is a question of law. See Fairchild Stratos Corp. Aircraft Missiles Division, ASBCA No. 8534, 65–2 BCA ¶ 4955. Similarly, "[w]hen a decision

concerning the allowability of an equitable adjustment turns on the proper interpretation of contract provisions, then what is ultimately involved is a question of law." Kaiser Industries Corporation v. United States, 340 F.2d 322, 334, 169 Ct.Cl. 310 (1965). Clearly, the issues involved here were questions of law for which there was no requirement of review by the contracting officer in the first instance.

■ Assuming solely for purposes of argument that this controversy was one that should have been submitted to the contracting officer, there was adequate administrative review. The disputes clause provided that controversies under the contract be decided by the contracting officer; in this instance, Lynch. Amtraco complains that it has been denied its right under the contract to have the issue determined by Lynch. In its communications with CCC as early as January 19, 1973, Amtraco addressed its correspondence to Gillis, Arent, and Ebert of the Minneapolis office. At no point during this exchange of correspondence did Amtraco complain that it was being prejudiced by the fact that Lynch was not handling the matter (Ex. 1 to Affidavit of Mr. Donald L. Gillis, sworn to September 25, 1974). Gillis was a contracting officer of the CCC, although he was not the contracting officer on these contracts. (Affidavit of Mr. Donald L. Gillis). Gillis, Arent and Ebert were acquainted with Amtraco's contracts. Anthony Grace and Sons, Inc., 60–2 BCA ¶ 2682. If Lynch were no longer employed by the Minneapolis office, his superiors would be capable of serving as his successor in dealing with Amtraco. See United States v. Haymarket Veterans Uniform Company, 228 F.Supp. 471 (D.Mass.), aff'd, 338 F.2d 698 (1st Cir. 1964). Amtraco is estopped at this late date from asserting that it has been prejudiced by the failure to have a preliminary determination of this controversy made by Lynch.

The correspondence between Amtraco and the Minneapolis office clarified the

positions of the contracting parties. See Keystone Coat & Apron Manufacturing Co. v. United States, 150 Ct.Cl. 277 (1960). The CCC officers set out the Government's method of computation (Letter from Ebert of Minneapolis office to Silver of Amtraco, dated January 24, 1973, Ex. 1 to Gillis Affidavit) and Amtraco responded. The Minneapolis office rejected Amtraco's interpretation of the contract and communicated its determination to Amtraco in writing. Amtraco apparently viewed this as a final decision of the contracting officer, as required by § 16A of MP–23, since on March 5, 1973 Amtraco notified the Minneapolis office that it intended to appeal its decisions to the Contract Disputes Board for CCC. Amtraco ultimately deferred filing its appeal until the Minneapolis office confirmed its opinion with officials in Washington. When the Minneapolis office received confirmation of its interpretation, Amtraco was informed.

 Although the exchange of communications may not have been a sufficient decision in those instances where the contracting officer is required to make a complex factual determination, the communications from the CCC, taken as a whole, did inform Amtraco sufficiently of the bases for the Government's decisions. See Davis v. United States, 180 Ct.Cl. 20 (1967). Amtraco was not prejudiced by the failure of the Minneapolis office to remind Amtraco of the time within which to appeal to the Contract Disputes Board since § 16 set the time for appeal and Amtraco notified the Minneapolis office of its intention to appeal.

With respect to the second cause of action which is based on Amtraco's unexcused failure to export all of the butter sold under the 1972 contract within the prescribed time period, it is not disputed that Amtraco failed to export 970,513 pounds of the 1,000,216 pounds of butter that it purchased for such resale abroad.

The contract was entered into on January 6, 1972. Between January 6, 1972 and September 18, 1972, Amtraco received five separate extensions of time within which to export the butter. Its sixth request for 180 days additional extension from December 22, 1972 was denied on December 18, 1972, and reconsideration of this denial was thereafter refused.

In its Third Affirmative Defense, Amtraco asserts that the denial of this application for an extension was inexplicable and improper, and therefore, that the Government was not entitled to the relief sought.

The exchange of correspondence on Amtraco's successive applications for the extension of time for performance under the 1972 contract in and of itself constitutes a sufficient record of administrative review. It was within the discretion of the Minneapolis office to grant an extension. That office notified Amtraco that the reasons given for the additional request were not sufficient to warrant an additional extension.

Defendant's motion to dismiss this suit for failure to exhaust administrative procedures is denied.

So Ordered.