## RUSS MITCHELL, Inc., et al. v. UNITED STATES.

No. 49582.

United States Court of Claims.
Feb. 5, 1952.

---

4. Dunnell's Minnesota Digest, §§ 9044, 9046A, 9048; Restatement, Restitution (1936), § 162.

M. U. S. Kjorlaug, Houston, Tex., for the plaintiffs. Boyles & Billingsley, Houston, Tex., were on the briefs.

S. R. Gamer, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Baldridge, for the defendant. John I. Heise, Jr., Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

On August 26, 1947, the Government invited bids for the construction of a powerhouse at Denison Dam, Texas. The bids were to be unit price bids, e. g. they were to show the price per cubic yard for which the bidder would place concrete in a specified part of the project. There were 88 separate items of work designated in the invitation for bids. As to 69 of these items, the invitation stated the Government's estimate of the number of units which would be required to complete them. As to the other 19 items, no such estimates were given. Regardless of the Government's estimate of quantities it was provided that the contractor would be paid for the actual number of units of work performed; measured after performance, whether that number was greater or less than the Government's estimate.

Of the 88 items into which the whole project was divided, Item 26 was "Concrete in Powerhouse Substructure." The invitation gave the Government's estimate of 5,000 cubic yards for this item. The plaintiffs, in preparing their bids on the various items of work, relied solely on the Government's estimate of the yardage of concrete in Item 26. They had been warned in the invitation for bids not to do this, but in view of the fact that the Government had, five years before, caused a practically identical powerhouse to be constructed nearby, they supposed that the estimate would be reasonably accurate. Computation would have been somewhat difficult because a considerable part of the volume of the substructure was to be occupied by a large tubular scroll case. But by merely computing the rectangular volume of the structure, without any allowance for the scroll case, it could have been determined that the estimate of 5,000 yards was too high.

Because the plaintiffs counted on pouring 5,000 yards of concrete in Item 26, their unit price bid per yard was considerably lower than it would have been if they had expected to pour and get paid for a substantially smaller number of yards, because the time used in pouring, the plant and equipment needed, and certain other fixed items would not be reduced by a reduction in yardage.

On September 26, 1947, at 2 p. m. the bids for the project were opened. There were only two bids and the plaintiffs' bid was the lower, at $839,971.40 based on the bid unit prices and the Government's estimate of numbers of units. After the bids were announced, a conference between the low bidder and certain Government engineers who were concerned in the project was called for 4. p. m. The purpose of this conference was to enable the Government's agents to ascertain whether the plaintiffs were qualified to do the work, to obtain information needed in preparing the formal contract, and to answer such questions as the bidder might propound. In the interval between the opening of bids and the 4 o'clock conference, a representative of the other bidder told the plaintiffs' representa-

tive that the estimate of yardage in Item 26 was too high. The same person also told one of the Government engineers the same thing.

At the 4 o'clock conference the plaintiffs' representative reported what he had been told about Item 26 and said that he had made a hasty calculation which verified the information. After other matters were discussed the plaintiffs' representative again raised the question of the yardage in Item 26. He was told that the invitation stated that the Government's estimates in the invitation were approximations only and that it was the bidder's responsibility to check the quantities. After further discussion the plaintiffs' representative asked when the plaintiffs would be called upon to sign the contract and was told that it would be sent them within thirty days. After the conference, the plaintiffs' representative discussed the Item 26 question again with the man who had been designated as resident engineer for the project, and asked his advice. This man suggested that the plaintiffs could execute the contract or not as they saw fit, or could execute it under protest if they so desired.

The invitation for bids had required that a bidder post, with his bid, a bond in the sum of 20% of his bid, warranting that he would not withdraw his bid and that he would execute a contract, if one was tendered to him on the basis of his bid.

On October 20, 1947, the Government sent the formal contract to the plaintiffs for signature, and the plaintiffs signed and returned it without protest or reservation. They proceeded to perform the contract. After the performance began, the plaintiffs' representative requested the Government's resident engineer at the job to authorize an adjustment in the contract price to compensate for the error in the estimate in Item 26. He was told that the resident engineer had no authority to do what he asked, but it was suggested that he file a claim. He did so, on January 27, 1948, in a rather lengthy letter of explanation. On July 2, 1948, he again wrote the resident engineer reminding him of the earlier letter. These letters were referred to the contracting officer. He, on September 20, 1948, sent to the Chief of Engineers a statement of the facts, and a recommendation that the General Accounting Office be requested to grant authority to reform the contract and increase the unit price of Item 26 to $34.61 per cubic yard. The contract price was $27 per cubic yard. The contracting officer's communication passed through channels and was rejected by both the Division Engineer and the Chief of Engineers. The contracting officer was directed to make a ruling on the claim and he did so by letter of December 23, 1948, to the plaintiffs, denying the claim.

The plaintiffs were not aware that the matter had been presented to the Chief of Engineers. On January 7, 1949, they appealed to that official from the contracting officer's decision. Item 7 of their grounds of appeal stated the fact of the bid bond which they had furnished with their bid, and said that they would have been "confronted with a severe liability under the bond" if they had declined to execute the contract.

On January 31, 1950, the Corps of Engineers Claims and Appeals Board, acting on behalf of the Chief of Engineers, disallowed the plaintiffs' appeal. The reason given for their decision was that, if the plaintiffs were materially prejudiced by the Government's mistaken estimate in Item 26, they could have withdrawn their bid without liability on their bid bond, citing Alta Electric & Mechanical Co. Inc., v. United States, 90 Ct.Cl. 466.

The actual amount of concrete placed by the plaintiffs under Item 26 of the contract was 2,873 cubic yards. They were paid $77,571 for it, at the contract price, which was $57,429 less than they would have received if they had placed 5,000 yards. We do not know what their costs of performance were, nor whether they suffered a loss or made a profit on the item. It is perhaps of significance that the other bidder, whose entire bid was much higher than the plaintiffs', bid of $22 per cubic yard as against the plaintiffs' $27 though the other bidder was aware that the Government's estimate of yardage was too high. The Government's estimate of cost was $30 per cubic yard without any allowance for overhead or profit. These large discrepancies seem to show that there was nothing like a

 

normal or usual price for concrete such as was used in Item 26, and that there was much leeway for profit or loss on the work.

The plaintiffs' suit is based upon the proposition that they were misled by the Government's mistaken estimate into making a bid, and a contract, which they would not have made but for the mistaken estimate. We may assume that their bid would have been different if they had known the facts. But as to the contract, they knew the facts, in general, and could readily have learned them, in detail, by computation before they made the contract. If, then, their bid had been only an offer, revocable until accepted, they could not complain about the contract which they made freely and with full knowledge. But the plaintiffs say, rightly, that their bid was not a revocable offer, but a firm offer guaranteed by a bid bond. They also say that they made the contract because they were coerced by the bid bond into making it. If we thought that this was the reason they made the contract, they might well prevail, as we are not impressed by the reason given by the Corps of Engineers Claims and Appeals Board for its decision. It held that since, under a decision of this court, the plaintiffs could have defeated a suit against them by the Government on their bid bond, they were free to contract or not as they pleased, and hence were not coerced. But whether one is coerced or not does not depend entirely on what his legal rights are. The threat of litigation, with its expense and uncertainty of result, may well be coercive, though the probability may be that the cause will be won.

We think that the plaintiffs did not execute the contract in suit because they felt coerced by their bid bond. Their computation, upon which their entire bid was based, included an allowance of not less than 23.8 percent of estimated direct costs and job overhead, for their main office overhead and profit. We are judicially aware that the normal profit included in such bids is about 10 percent, and the normal main office overhead about 6 percent. The plaintiffs, therefore, at the opening of the bids found themselves in prospective possession of an extremely profitable contract, even after deducting for a disappointment, or possible loss, on Item 26. It would have been imprudent, it would seem, to revoke their bid if they had been free to do so, and thus open the project for new bids, with their competitor in full knowledge of their bid. We are confirmed in our view that the plaintiffs were not coerced into executing the contract by the pressure of the bid bond by the fact that in their several oral and written requests for an adjustment of the price on Item 26 they made no mention of the bid bond. It is incredible that if the bid bond was, as they claim, the cause of their making a contract which they were unwilling to make, that fact would not have been put forward seasonably as at least one reason why they should have relief. But not until their appeal from the contracting officer's decision to the Chief of Engineers did they even mention the bid bond.

The plaintiffs have not made out a valid case for the reformation of their contract, and their petition must be dismissed.

It is so ordered.

JONES, Chief Judge and HOWELL, WHITAKER and LITTLETON, Judges, concur.