**JEFFERSON CONSTRUCTION COMPANY**

v.

**The UNITED STATES.**

**No. 1–64.**

United States Court of Claims.
July 16, 1965.

Philip M. Cronin, Boston, Mass., attorney of record, for plaintiff. Withington, Cross, Park & McCann, Boston, Mass., of counsel.

Edward Weintraub, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 54(b) to Trial Commissioner Roald A. Hogenson with directions to make his recommendations for conclusion of law. The Commissioner has done so in an opinion filed on February 18, 1965. Plaintiff sought review of the commissioner's opinion and recommendation for conclusion of law, briefs were filed by both parties and the case was submitted to the court without oral argument by counsel upon waiver of oral argument. Since the court is in agreement with the opinion as hereinafter set forth, and recommendation of the trial commissioner, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover. Defendant's cross-motion for summary judgment is granted, plaintiff's motion for summary judgment is denied and plaintiff's petition is dismissed.

OPINION OF COMMISSIONER

This is a suit on a bid contract awarded by General Services Administration to plaintiff on February 2, 1962, designated No. GS 01B–4034, pursuant to which plaintiff, a Massachusetts corporation engaged in the construction business, undertook to demolish and remove existing buildings and structures and construct facilities in the remodeling of GSA-FSS Stores Depot, Hingham, Massachusetts. The contract documents were drawn by defendant.

The issues concern the responsibility for the damaged condition of a large compressor removed as an item of salvage materials from one of the buildings by plaintiff's demolition subcontractor, Central Building Wrecking Co., hereinafter called Central. This case is presented for decision on plaintiff's motion and defendant's cross-motion for summary judgment. It is my opinion that plaintiff's motion should be denied, defendant's cross-motion granted, and plaintiff's petition dismissed.

Both parties rely solely upon the administrative record consisting of the transcript of the testimony of two officers of Central before the GSA Board of Contract Appeals and other pertinent documents. The facts stated in this opinion are derived solely from such record. The Board found that plaintiff and/or its subcontractor misjudged the actual value of the large compressor as a result of their failure to remove the protective covering therefrom when making an inspection in preparing the bid on the demolition work. After setting forth the contract language pertaining to responsibility for the condition of salvage materials, the Board stated that such provisions appear to relieve defendant of any responsibility for damage to such materials, whether occurring before or after the awarding of the contract. The Board concluded its decision by stating that its preceding remarks were of the character that would be included in a decision on the merits, but since the claim was one for unliquidated damages, the Board lacked jurisdiction, and the appeal was dismissed. GSA B.C.A. Docket No. 854.

Clause 4, entitled "Changed Conditions," of the General Provisions of the contract provides as follows:

The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (a) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (b) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase

or decrease in the Contractor's cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; or unless the Contracting Officer grants a further period of time before the date of final payment under the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 of these General Provisions.

The referenced Clause 6 is the standard Disputes article, under which the Board acted as the duly authorized representative of the head of the agency in hearing the appeal from the decision of the contracting officer.

Both before the Board and in its petition and brief herein, plaintiff claims that the damaged condition of the compressor was an "unknown physical condition" within the meaning of Clause 4, entitling plaintiff to an equitable adjustment. The Board's decision contains neither findings of fact nor conclusions of law on this theory. Plaintiff contends that the Board erroneously ruled that it lacked jurisdiction of plaintiff's claim, and suggests that "it may be that the case should be remanded to the Board for a determination on the merits." Defendant asserts that the "Changed Conditions" clause has no applicability, but that if the court decides otherwise, this case should be remanded to the Board for further proceedings.

GSA issued the invitation for bids for the depot remodeling project on December 11, 1961, and the bid opening was scheduled for January 18, 1962. Bidders were instructed that they were to request in writing any desired explanation of the meaning of the invitation, drawings, or specifications, that any such interpretation would be issued to all prospective bidders in the form of a written amendment, and that oral explanations would not be binding. Regarding inspection of the site and work to be done, the instructions to bidders stated as follows:

2. *Conditions Affecting the Work.* Bidders should visit the site and take such other steps as may be reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Failure to do so will not relieve bidders from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government will assume no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of the contract, unless included in the invitation for bids, the specifications, or related documents.

After having reviewed the instructions to bidders and the project plans and specifications, Central inspected the job site and conditions for 2 days about a week before the opening of bids on January 18, 1962. As a prospective subcontractor, it was preparing its bid on the demolition and salvage work, which it submitted to several rival bidders of plaintiff prior to the bid opening date. In such bid, Central proposed to perform the required demolition work, take title to the salvage materials, and pay $27,000 to the prime contractor under a subcontract.

After learning that plaintiff was the low bidder, Central contacted plaintiff for the first time and was invited by plaintiff to submit a bid for a demolition subcontract. Central was told by plaintiff that plaintiff had taken bids from other wrecking ocmpanies on such work, and that in computing its bid on the prime contract, plaintiff had used as the sum to be received from such a subcontractor a figure higher than the $27,000 amount Central had proposed to pay to others. Central was further told by plaintiff that plaintiff would award the subcontract to Central if its bid was

at least as much or more than any other received. Central then reinspected the job site and conditions for one day, and thereafter negotiated with plaintiff on January 28 and 29, 1962. On the latter date Central and plaintiff agreed orally that Central would perform the demolition work, take title to the salvage materials, and pay plaintiff $39,000.

On February 2, 1962, defendant by written notice awarded plaintiff the prime contract. About February 4, Central by letter confirmed its oral agreement with plaintiff. The prime contract between plaintiff and defendant was executed on February 28, 1962.

By letter dated February 28, 1962, plaintiff accepted Central's quoted price of $39,000, advised that a formal subcontract would follow, and authorized Central to commence work on March 5, 1962. On March 6, 1962, Central first discovered the damaged condition of the compressor, and immediately notified plaintiff and defendant's architect-engineer in writing. The subcontract, executed by Central and plaintiff respectively on April 26 and 27, 1962, conformed to the oral agreement reached by them on January 29, 1962.

Incidental to the demolition work performed by Central was the salvage of various materials including 16 traveling cranes, 1,300 tons of steel decking, various miscellaneous items, and the large compressor in question. Central obtained title to such materials from plaintiff by virtue of a subcontract provision to the effect that all material resulting from the demolition work was to become Central's property. Plaintiff's title to such materials was derived from defendant by the terms of section 6–02 of the contract specifications, providing as follows:

> 6–02. SALVAGE AND SALVAGED MATERIALS. Except as otherwise specified herein, or noted on drawings, the Contractor shall receive title to all property to be demolished which is not specifically designated as being retained by the Government, said title to vest in the Contractor immediately upon the Contractor's receipt of the Notice of Award. The Government will not be responsible for the condition of or any loss or damage to such property from any cause whatsoever. All salvage materials removed shall be taken from the premises promptly, as the storage of salvage materials on the site will not be permitted. Bidders shall take into account the salvage value to them of the materials removed, and such value shall be reflected in the bids.

The compressor in question was located in a concrete building which was to be remodeled into a pump house. The contract drawing of the pump house plan stated that the concrete compressor foundation was to remain, but that the compressor and appurtenances were "to be salvaged." On the other contract drawings, salvage material was merely marked "to be removed."

Until Central started work on the compressor on March 6, 1962, the compressor was completely enclosed in a protective covering comprised of a heavy, treated, dark building paper (known as Sisalkraft) nailed to the wooden strips comprising the covering frame. The covering structure, about 25 feet long and 9 feet high, was taped at the bottom onto the concrete floor. The only apertures were four small isinglass peep holes, each 3 inches by 4 inches. The compressor was the only item of salvage materials with any protective covering.

When Central made its site inspections, the compressor building was locked, and each time Central was required to obtain the key. Central's inspection of the compressor consisted of looking through the isinglass peep holes by use of a flashlight. The cylinder heads could not be seen. The shafts were heavily coated with grease. A few valves and pieces of piping were lying loose on the floor inside, as were several wrapped and sealed packages. Also there could be seen several cans of silica jell, placed therein to reduce the moisture content of any air penetrating the covering.

By this means of inspection, Central also observed the compressor's name plate from which it obtained the information as to the make, capacity, and size of the machine. With this information, it made inquiry of the manufacturer concerning the compressor, was told by some unnamed party or parties that the Government carried the compressor on its books at a value of $125,000 and that its probable age was 18 to 19 years, conferred with an engineer of a machinery company as to the replacement cost of such a piece of machinery, and decided that the compressor had a "fair salvage value" of $30,000.

In formulating its bid to plaintiff for the demolition subcontract, Central estimated that all salvage items had a total value of $130,000, including the compressor at $30,000. It computed that its total costs to perform the subcontract would be $90,000 to $100,000, including allowances for overhead and profit, leaving a credit of $30,000 to $40,000, out of which the payment of $39,000 to plaintiff for the subcontract was to be made.

On March 6, 1962, Central removed the Sisalkraft covering and immediately discovered that both of the cylinder heads of the compressor were cracked. These heads could not be seen without removal of the covering. Within a day or two thereafter, the compressor was partially disassembled by a mechanic of the ultimate purchaser, and it was then disclosed that the pistons and other interior parts were damaged. These damages were reasonably ascribed to freezing of water in the cooling system of the compressor at some indefinite time in the past. The building had been unheated for a number of years. While the compressor had been in the building during that time, there is no evidence as to how long it had been covered. The compressor in its damaged condition was, of course, not operable, and Central sold it to a used machinery dealer for $9,500.

In placing the $30,000 valuation on the compressor, Central assumed it was in operable condition because the pump house plan stated it was "to be salvaged" and because it had been "mothballed," that is, preserved in the manner above-described. The testimony of Central's officer that "to be salvaged" meant to *him* that the compressor was in operable condition is at best the advancement of a privately held personal opinion, not at all evidence of a meaning ascribable to both parties to the prime contract as trade talk generally understood in the salvage business. This witness quite reasonably conceded that "a salvage value" was realized by Central upon sale of the inoperable compressor to a dealer for $9,500.

The effort of Central's witnesses to explain their failure to remove the covering and make more than a peep-hole inspection by flashlight of a major salvage item consisted of the general statement that it was of benefit to Central and other bidders to keep the compressor under protective covering. They admitted that Central made no request for removal of the covering, and conceded that no one had stated or indicated that removal would be refused. Central's inspections occurred shortly before and after the bid opening date. The last inspection was made in connection with negotiations with the known low bidder on the prime contract. The strong inference arises from the circumstances that Central expected that this project would soon commence with demolition and removal of salvage materials the first order of business. The benefit which would thereafter enure to any demolition subcontractor by not removing the protective covering would at most be the avoidance of the minimal effect of having the compressor exposed to humid air for the short period of time reasonably expected to intervene before commencement of salvage operations. Had a request then been made for removal of the covering, it is inconceivable under the circumstances that defendant would have refused.

If Central had removed the Sisalkraft covering at the time of inspection, its representatives would have immediately discovered the cracked cylinder heads

and would have realized that there was also damage to internal parts. In the above-quoted instructions to bidders, reviewed by Central, bidders were admonished to inspect the conditions which would affect the work and the cost thereof, and the parties agreed in the above-quoted section 6–02 of the specifications that the bidders would take into account the value to them of salvage materials and that the Government was not responsible for the condition of salvage materials from any cause whatsoever. Under the terms of the contract, plaintiff and its subcontractor must bear the risk of their failure adequately to inspect. Defendant did not subject itself to liability when the compressor failed to meet Central's expectations as to its condition. See American Sanitary Rag Co. v. United States, 161 F.Supp. 414, 415, 142 Ct. Cl. 293, 296 (1958) ; and Paxton-Mitchell Co. v. United States, 172 F.Supp. 463, 464, 145 Ct.Cl. 502, 504 (1959).

■ Plaintiff contends, however, that section 6–02, as well as section 2–4, hereinafter quoted, should be construed to place the responsibility for the condition of salvage materials upon the contractor only after title vested in it by the awarding of the contract. By reference to the first three of the four sentences therein, plaintiff advances the ingenious argument that section 6–02 is designedly chronological in the order of the subject matter of those sentences: (1) First, the contractor receives title upon notice of award; (2) then, the Government is no longer responsible for the property; and (3) finally, the contractor removes the salvage materials from the job site. From this premise, plaintiff argues that only after title passed was defendant relieved of responsibility for the condition of salvage materials, and in the absence of any other provision absolving the Government from liability for loss or damage prior to award, that it is a reasonable construction of section 6–02 and section 2–4 to hold the defendant liable for any damaged condition preexisting the contract award. Plaintiff relies on the doctrine of Peter Kiewit Sons' Co.

v. United States, 109 Ct.Cl. 390 (1947), that ambiguous contract provisions, susceptible to more than one reasonable construction, will be construed against the defendant as the party who drafted the contract.

Other than section 6–02, the only other provision of the contract pertaining to responsibility for damage to salvage materials is section 2–4 of the specifications, providing:

> 2–4. SALVAGE.—The Government does not assume responsibility for any loss or damage to materials or structures on the site, the salvage value of which the Contractor may have reflected in his bid.

As contended by plaintiff, this section is reasonably susceptible of the construction that the Government is relieved of liability only for loss or damage to salvage materials occurring *after* the contract award. The concluding clause "the salvage value of which the Contractor may have reflected in his bid" is then meaningful. Clearly at the time of the inspection, the contractor has not made and submitted his bid. The term "reflected in his bid" suggests termination of Government responsibility no earlier than bid submission and reasonably at the time of contract award.

However, section 2–4 concerns only "loss or damage," whereas section 6–02 relates to "condition of or any loss or damage to such property from any cause whatsoever." Plaintiff's argument of chronological sentence structure falls with the fourth sentence of section 6–02, in which it is stated that "Bidders shall take into account the salvage value to them of materials removed, and such value shall be reflected in the bids." Only by inspection prior to bidding could bidders determine the value to them of salvage materials to be reflected in their bids, as the salvage materials are not described as to condition in the contract documents. The condition of items of machinery is obviously basic to their value, and only adequate inspection would afford a sound basis for evaluation. Plaintiff's interpretation is unreasonable

in that it confuses responsibility for determining condition at time of inspection with loss or damage after contract award, and gives less than full meaning to the alternative language "condition of or any loss or damage to such property from any cause whatsoever."

Plaintiff further contends that it is entitled to recover for the use and benefit of Central on the grounds that there was a mutual mistake of fact, both on the part of the Government and the contractor, with respect to whether the compressor was in operating condition at the time of inspection and bidding. There is no direct evidence that defendant's contracting officer or any of his representatives believed it to be. Plaintiff must rely upon the assumption made by Central from the status of "mothballing" of the compressor, and ascribe such a belief to defendant's agents, but it does not follow that all reasonable men would conclude under the circumstances of this case that an operable compressor was enclosed in the protective covering. Aside from this insufficiency of evidence, plaintiff cannot recover on a theory of mutual mistake because the contract terms invite inspection by the bidders of the salvage materials for determination of value to them, and the Government is expressly relieved of responsibility for the condition of such property from any cause whatsoever. Under such contract terms, and whereas in this case there are no contract representations as to the condition of such property, plaintiff is precluded from recovering damages on the theory of mutual mistake. American Sanitary Rag Co. v. United States, supra, and cases there cited.

The term "unknown physical conditions" in the above-quoted "Changed Conditions" clause of the contract could in a broad general sense be interpreted to cover the inoperable conditions of the compressor. However, there is no evidence that in the business of demolition and salvage, such inoperable condition of used machinery would be generally understood to be of an "unusual nature," or

that such condition of an item of salvage material differed from those "ordinarily encountered and generally recognized as inhering" in demolition and salvage work. As in the case of plaintiff's theory of mutual mistake, plaintiff is precluded from resting its claim for damages on the general language of the "Changed Conditions" clause by the specific contract terms that defendant was not responsible for the condition of salvage materials from any cause whatsoever.

Furthermore, since plaintiff and Central did not make a reasonably adequate inspection of the compressor as directed by the instructions to bidders, and since no representation was made in the contract as to the condition of the compressor, plaintiff is not eligible for an equitable adjustment for the use and benefit of Central for changed conditions alleged to be different from those ordinarily encountered and generally recognized as inhering in the work of the type covered by the contract. S. T. G. Construction Co. v. United States, 157 Ct.Cl. 409, 415 (1962).