**PERINI CORPORATION, Walsh Construction Company, Ralph E. Mills Company, and Blythe Bros. Company, Inc., Bodies Corporate and Joint Venturers, trading under the name of Perini, Walsh, Mills & Blythe Bros. Construction Companies**

v.

**The UNITED STATES.**

No. 228–58.

United States Court of Claims.

July 20, 1967.

---

John W. Gaskins, Washington, D. C., attorney of record, for plaintiffs. Robert H. Burrage, Jr., and King & King, Washington, D. C., of counsel.

Robert R. Donlan, Washington, D. C., with whom was Asst. Atty. Gen., Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

COWEN, Chief Judge.

The central issue in this contract case is whether a substantial variation from an estimated quantity in contract specifications constitutes a changed condition within the meaning of the standard Changed Conditions article, when the facts establish that the variation was foreseen by the contractor and should reasonably have been anticipated by the Government. That question, and a host of related ones, have generated protracted proceedings before the contracting officer, the Corps of Engineers Claims and Appeals Board, and in this court.[1] What is unique here is that the Government rather than the contractor is the party claiming that a changed condition existed. For the reasons discussed below, we reject the Government's position. We hold that a material variation from an estimated quantity, here consisting of an overrun in the amount of water to be pumped from a specified area, did not constitute a changed condition within the circumstances of this case and therefore that plaintiff is entitled to be paid the stated contract price for the entire amount pumped.

I

The instant contract is one of a series contributing to the completion of the Jim Woodruff Dam on the Apalachicola River near Chattahoochee, Florida. In order of time, it was the third major contract for the work at the site. The first was for the erection of an earth overflow dike to be built on the east bank of the river by the Shepherd Construction Company; the second, still being performed by plaintiff[2] at the time the invitation for bids on the instant contract was announced, was for the construction of a lock and fixed crest spillway.

The contract here involved the construction of a gated spillway, powerhouse and switchyard. The work was to be performed in two separate cofferdam stages in order to avoid interrupting the riverflow and to permit navigation during the construction period. The first cofferdam stage included the major portion of the gated spillway and switchyard embankment construction; the second, the powerhouse and the remainder of the spillway and switchyard structures. Both the gated spillway and the powerhouse were to be located in the river bottom but were to be constructed in the dry within the cofferdams. These requirements meant that water would have to be pumped from the worksite.

In November of 1951, an invitation for bids for the contract was issued. It

---

1. At the trial before our commissioner, both parties proceeded on a de novo basis and no objection was made by either to the offer of evidence beyond that received by the Corps of Engineers Claims and Appeals Board. After all proof was closed, defendant objected to the consideration of the de novo evidence on the basis of the decision of the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

However, because of the time and effort expended in the trial of the case in this court, defendant has expressly waived any right to have the case confined to the record before the Board or to have the case remanded to the Board. (Defendant's brief, page 1, n. 1.)

2. Plaintiff is in fact a joint venture of four corporations. For convenience, the joint venture will be referred to as plaintiff.

requested that the bids be submitted on the basis of a price schedule containing 153 pay items, most of which were based on a unit price, but some called for lump sum bids. Included were Bid Items 2 and 102 which required the submission of separate unit prices for pumping units of 1,000 gallons of water per unit for the first and second stage cofferdam areas respectively. The Unit Price Schedule stated an estimated quantity of 323,000 units for Item 2 and 302,000 units for Item 102.[3] The contract also contained the usual clauses requiring the bidders to make their own site inspection.

Plaintiff bid 40 cents per unit for Items 2 and 102. Despite the fact that these unit prices greatly exceeded those of the other bidders, plaintiff's total bid of $13,907,379.60 was the low bid, and plaintiff was awarded the contract at that price. The contract was dated January 18, 1952; the notice to proceed was received by plaintiff on February 15, 1952.

Large quantities of water were encountered almost immediately during the first stage work. By August 12, 1953, pumping from that area had already exceeded the estimated 323,000 units by more than 100 percent. On that account, plus a report from a Government geologist that similar conditions would lead to even greater excesses with respect to the unstarted second stage area, defendant's Resident Engineer asked plaintiff for proposals and comments in view of the "quite high" unit prices for pumping. When plaintiff demurred, defendant suggested that it assume some of the pumping. The plaintiff by letter of September 10, 1953, objected to this proposal. Subsequently, plaintiff suggested a revised dewatering plan for the second stage cofferdam.

On May 17, 1954, defendant again requested plaintiff to agree to a reduction in the contract price for pumping. Plaintiff again refused. Then, in June, plaintiff was asked to accept a substitute price of 15 cents per unit for the second stage. Plaintiff was also informed that if it failed to agree to the proposed price substitution, defendant would issue a change order reducing the contract unit price. Plaintiff declined to make any change in the contract price, pointing out that "to the present time no pumping whatever has taken place with respect to the Second Stage Cofferdam."

Work began in the second stage area. By the end of November 1954, plaintiff had pumped 1,137,620 units above the the 302,000 units estimated for this stage. One month later, the contracting officer issued Change Orders Nos. 19 and 20. Change Order 19 dealt with the first stage area which had been completed one year earlier and for which plaintiff had already been paid the contract price. The order asserted that a changed condition existed in the subsurface conditions and added a new item to the Unit Price Schedule, which provided for pumping 502,501 units, the exact number of units plaintiff had pumped above the original estimated quantity. For the pumping of that quantity, the change order fixed the price at 25 cents per unit instead of the 40 cents bid by plaintiff.

Change Order No. 20 stated that a changed condition existed in the subsurface conditions of the second stage area and set forth a temporary unit price of 10 cents per unit (instead of 40 cents) pending final determination "of such new and final price." It also raised the estimated quantity of water to be pumped from the second stage to 2,000,000 units. On March 28, 1955, a supplement to Change Order No. 20 fixed the "new and final price * * * for all quantities" of water pumped from the second stage area "in excess of the original estimate of 302,000 units" at 8 cents per unit, and increased the estimated quantity of such item to 2,150,000 units.

The contract as extended was completed on September 25, 1955. As of that date, plaintiff had pumped from the first stage area 825,501 units of water

---

3. How these estimates were arrived at is discussed in Part IV infra.

instead of the 323,000 units originally estimated. From the second stage area, plaintiff had pumped 6,600,818, units instead of the 302,000 units estimated.[4]

An explanation of this enormous overrun entails a review of the facts relating to the water-carrying potential of the rock that had to be excavated for the foundations of the structures, as well as the water conditions that prevailed in the foundations themselves. As previously stated, the contract was to be performed in the dry on the river bottom of the Apalachicola River. The river bottom consisted of four layers of various materials and strata. In descending order, the first layer was composed of an overburden of sands and gravels. The second layer, known as the Tampa formation, was a limestone stratum of the rock which plaintiff was to excavate for the powerhouse and gated spillway foundations. This formation was highly porous and permeable, possessing a large number of interconnected channels, pits and cavities. The third layer, known as the Suwannee formation, consisted of limestone and dolomite rock of very high porosity and permeability. At the uppermost part of this formation immediately below its contact with the Tampa formation was a thin layer of dense limestone known as the D-zone. Because of its density, the D-zone usually operated as an aquaclude or partial obstacle to the passage of water from the Suwannee to the Tampa formation. The fourth layer, known as the Ocala formation, was another porous limestone stratum containing a more highly developed system of interconnected solution channels, cavities and pits than either the Tampa or Suwannee formations.

Since the contract required construction in the dry in a river bottom composed of such material, it was obvious the contract work would meet with great difficulties in terms of the amount of water to be pumped.[5] In point of fact, the Tampa, Suwannee and Ocala limestone formations at the site were part of a well known and much publicized artesian aquifer system which underlies almost all of Florida and which supplies approximately 90 percent of the public and private water supply for that state.

An equally important cause of the water pumping problem was the fact that the several formations in the site area were not horizontal. Rather, commencing upstream, they dipped in a downstream direction. As a result, each formation in shinglelike fashion was progressively exposed to the river water at a point of intersection upstream of the site, allowing water to enter the formations. Such continual upstream recharging produced an artesian water condition at the site, for, after the river water entered the formations, it then passed through the interconnecting cavities and channels in the limestone rock into the cofferdam area.

The D-zone, the aquaclude which was expected to prevent the large flow of water into the cofferdams, failed for several reasons. Since it was located below the Tampa formation, the D-zone could not prevent the river water from recharging this formation. Neither could it prevent artesian water, apart from the river recharging in the Tampa formation itself, from flowing into the protected area. Moreover, the D-zone did not extend as an unbroken layer over the entire worksite, either because of natural causes or exploratory drilling and excavation work. Therefore, wherever the D-zone was absent, the water under artesian pressure would escape from the underlying Suwannee formation.

4. Plaintiff actually pumped 7,564,610 units by the time it ceased all pumping operations in the second stage area. Since the contract provided for payment only for pumping performed within the contract period plus duly authorized extensions, plaintiff's claim is limited to the 6,600,818 units pumped by September 25, 1955.

5. In the "Definite Project Report on Jim Woodruff Dam" published in revised form in 1948 and not made available to contract bidders, paragraph 35 of Appendix II warned that "all indications point to a difficult cofferdam problem which is likely to entail substantial expenditures to overcome."

By far the greatest source of water in the second stage, area however, was an ancient river channel located to the east of the open end of the second stage cofferdam. Filled with highly permeable river sediments and cut into the rock underlying the switchyard area, the channel's depression cut through the Tampa formation, the D-zone of the Suwannee formation, and into the Su-. wannee itself. The absence of the D-zone in this area meant that the water under artesian pressure in the Suwannee formation would escape by flowing horizontally through the formation until it reached the edge of the old river channel. At that point the water would pass through the porous sands and gravels filling the channel and then flow into the second stage cofferdam area through its unprotected side on the east bank. The old channel proved to be the source of 60 to 70 percent of the water pumped from the second stage area.

## II

Plaintiff timely appealed Change Orders Nos. 19 and 20 to the Corps of Engineers Claims and Appeals Board.[6]

The Board held that the material variations in estimated quantities of water experienced were not due to the discovery of subsurface, physical conditions at the site materially differing from the description of those conditions as set forth in the contract plans and specifications. Moreover, the Board did not find the existence of unknown physical conditions of "an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications." Instead, the Board held, as a matter of law, that a material variation in the estimated quantity of a unit price item, in and of itself, supports an application for relief by either party under the "Changed Conditions" article. It further held that the mutual ground upon which the parties contracted with respect to the amount of water to be encountered was provided only by the estimated quantities stated in the contract, and that such estimated quantities could not be the subject of a unilateral mistake, because neither plaintiff nor any other bidder had the right to substitute his own figure for that provided in the contract.

Having found that it was impossible to estimate the quantity of water to be discovered with any degree of accuracy, that all other subsurface data militated against the contract estimates, and that no effort was made by the Government to invoke the Changed Conditions article until after work on the second stage had begun, the Board made no adjustment for the overrun on the first stage area.

Again, in view of the uncertainty at the time the contract was entered into regarding the amount of water that would have to be pumped from the second stage, the Board held that an overrun of 150 percent of the estimated quantities was not a condition materially differing from those indicated. The effect of this decision was to allow the Government an equitable adjustment in the unit price in excess of the 150 percent overrun. As a result of the Board's decision, plaintiff was paid the contract price of 40 cents per unit for the first 302,000 units and for an additional 450,-000 units (the 150 percent overrun allowed) from the second stage. For the remaining units, plaintiff was paid 8 cents per unit.

In this action plaintiff seeks recovery based on the contract price of 40 cents per unit for all of the units pumped in the second stage during the contract period as extended, less the amount paid.

In its first counterclaim, defendant alleges that the reasonable cost of the pumping was considerably less than the 8 cents per unit paid plaintiff, and it seeks recovery for the difference be-

6. Plaintiff also presented to the Board a claim for extra work performed on the second stage cofferdam. The appeal was sustained, the claim was paid, and it is no longer in issue, although it was made the subject of defendant's second counterclaim. See footnote 7.

tween 8 cents per unit and the reasonable cost of the pumping.[7]

After the trial commissioner's report was made and after the briefs and exceptions of both parties had been filed, defendant moved for leave to amend its answer to assert a third counterclaim, in which it alleges that the Board's decision, allowing plaintiff the 150 percent overrun at the contract price on the water pumped from the second stage area, was erroneous, unauthorized, and contrary to law. Defendant seeks to recover the difference between the 40 cents per unit paid for the 453,000 units of overrun and plaintiff's actual cost. We ordered that the question of whether defendant should be permitted to file its third counterclaim at such a late date and also the question as to whether it is entitled to recover thereon be argued along with the other issues in the case.

### III

█ We deal first with defendant's contention that the decision of the Corps of Engineers Claims and Appeals Board, with respect to the overrun in the second stage area, is final and conclusive as a determination of fact, unless it is found to be arbitrary, capricious, or not supported by substantial evidence. Were the question here one of simple fact, as is the situation in many cases arising under the Changed Conditions article,[8] defendant's point would be well taken, but this case involves more than that—

it involves the proper legal standard to be applied under that article. Since the ultimate determination of liability turns on a proper interpretation of the provisions of the contract, a question of law is presented which we are free to answer independently of the Board's decision.[9]

As previously stated, the Board held that a material variation in the estimated quantity of a unit price item, in and of itself, constitutes a changed condition. That conclusion is a decision on a question of law that falls within the purview of Section 2 of the Wunderlich Act.

### IV

Written in the disjunctive, the Changed Conditions article sets forth two alternatives as the basis for the existence of a changed condition. The first allows an adjustment for the discovery of "subsurface and/or latent physical conditions" which differ materially from those shown on the drawings or indicated in the specifications. This clause has no application here since the specifications were replete with warnings of the water-bearing capacity of the rock strata in the worksite area. For example, Part IV, Section 1, Paragraph 1–02(g), dealing with "Foundation Leaks," warns that "[s]prings, leaks, and/or aquifers probably exist in the foundation for the gated spillway, powerhouse, and switchyard, that will require grouting for their control * *."

---

7. In its second counterclaim, the defendant alleges that the Board decision in Appeal No. 971 (relating to additional work on the cofferdam for which plaintiff's claim for additional costs was paid) was arbitrary, capricious, and not supported by substantial evidence. Defendant asked for a judgment for the amount paid on the claim. Since the trial commissioner's report in this case was filed, defendant has abandoned its second counterclaim.

8. See National Concrete & Foundation Co. v. United States, 170 Ct.Cl. 470, 475 (1965); Lenry, Inc. v. United States, 297 F.2d 550, 551, 156 Ct.Cl. 46, 49 (1962); Ivy H. Smith Co. v. United States, 154 Ct.Cl. 74, 83 (1961).

9. "Simply because an 'equitable adjustment' is involved does not automatically project the case into the category of that kind of contract dispute to which administrative finality attaches. The fundamental issue is the basic nature of the controversy. When a decision concerning the allowability of an equitable adjustment turns on the proper interpretation of contract provisions, then what is ultimately involved is a question of law." Kaiser Ind. Corp. v. United States, 340 F.2d 322, 333–334, 169 Ct.Cl. 310, 330–331 (1965). See also United Contractors v. United States, 368 F.2d 585, 596 n. 5, 177 Ct.Cl. ——, —— (1966).

Subparagraph (e) of Paragraph 2–03 of Part IV, Section II, as amended, also reads:

(e) *Exploratory Excavation.* It is very likely that fissures, cracks, joints, clay or disintegrated rock pockets and the like may be encountered that will require excavation below the normal foundation grades, of the concrete structures and the core trench of the switchyard embankment.

Likewise, Part IV, Section III, Paragraph 3–05(h), Cofferdam Grouting, states that "[s]prings, leaks, and/or aquifers probably exist in the foundations for the gated spillway and powerhouse and switchyard and connection to existing overflow dike that will require grouting for their control * * *."

Also, the various core borings at the site of the work, set forth in the logs of the contract drawings and inspected by plaintiff, indicated that the rock in the areas encompassed by both the first and second stage cofferdams possessed a high degree of cavitation in the form of numerous solution pits, channels, cavities and other openings in the limestone. The logs also reported low core recovery and loss of drill water during the core drilling operation, two factors indicating cavities and other openings and revealing that the rock formations would be heavily water bearing. More important, included in the contract drawings was a core boring geologic profile, which reported the existence of the ancient river channel and which revealed that it cut through the Tampa formation and the D-zone into the Suwannee limestone formation. The existence of the old channel as shown by the profile indicated that large quantities of artesian water under considerable pressure would have access to the area to be protected by the second stage cofferdam.

While performing the earlier lock and fixed crest spillway contract, plaintiff had taken various three dimensional photographs to which the attention of bidders for the instant contract was directed by the contract specifications. This same specification, Part IV, Section II, Paragraph 2–03(e), as amended, stated that the conditions in the photos "are expected to be very similar in the foundations for the structures to be constructed by this contract * * *." The photos showed the kind and type of rock encountered, the fissures, cavities, solution channels and pits that had been found in such rock, the presence of artesian water emerging from the rock, and the extensive wellpoint and deepwell dewatering equipment that was required to cope with the water. The conditions ultimately encountered within the excavated area during performance of the work under the contract were in fact very similar to the conditions depicted in the photographs.

In short, it cannot be said that the subsurface or other conditions experienced in the performance of the contract differed materially from those shown on the drawings or indicated in the specifications. As the Board itself found, the contract documents, exclusive of the Government's quantity estimates, "quite accurately foretold the conditions which were actually experienced."

■■ It is the second half of the operative language of the Changed Conditions article upon which the defendant places its principal reliance in this case. First, it argues that a substantial variation from an estimated quantity, without more, constitutes an "unknown physical condition of an unusual nature differing materially from those ordinarily encountered' and, therefore, amounts to a changed condition. We reject this argument in view of our consistent holdings that to qualify as a changed condition, the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience if any, as a contractor in the area.[10] This

10. E. g., Amino Bros. Co. v. United States, 372 F.2d 485, 490, 178 Ct.Cl. ——, —— (1967); United Contractors v. United States, 368 F.2d 585, 599, 177 Ct.Cl. ——,

court has not held that a substantial variation from the estimated quantities, standing alone, is sufficient to establish the existence of a changed condition under Article 4.

The cases that have applied the Changed Conditions article to substantial variations from the quantity estimated in the contract have done so on the basis that such a material deviation was not reasonably foreseeable. They deal with special situations where (1) the contractor could· not have verified the estimated quantities from the contract documents and his investigation of the site; (2) he had no opportunity to investigate the conditions at the site or for other reasons had the right to rely on the Government's estimate, or (3) both parties labored under a mutual mistake as to the accuracy of the Government's estimates.[11]

Defendant's second and main contention is that a mutual mistake of fact existed here, because neither party contemplated nor was able to foresee a material deviation from the estimated quantity of water that was to be pumped.

Although the Board found that it was impossible to estimate the quantity of water to be pumped with any degree of accuracy, our finding, following a de novo trial, is that it was not possible to make a close estimate of the amount of water to be pumped. The latter finding is controlling.

The difficulty of making an accurate estimate of the quantity of water that would be encountered under the conditions that were known to exist was plainly indicated by the specifications, drawings, core borings, and logs referred to above. In addition, two sections of the specifications warned prospective bidders that the risk inherent in that difficulty would fall upon them.

Paragraph GC–3, entitled "Site Investigation and Representation," provides that:

The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and subsurface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the Contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work.

Paragraph SC–3 of Part III, "Special Conditions of the Specifications," states that the contractor will be required to complete the specified work in accordance with the contract and at the contract prices, "whether it involves quantities greater or less than the estimated amounts so listed."

Implicit in such language was the admonition that the contract estimates were approximations only and that pumping in excess of the stated quantities

—— (1966) ; Jefferson Constr. Co. v. United States, 348 F.2d 968, 972–973, 172 Ct. Cl. 650, 661 (1965) ; Kaiser Ind. Corp. v. United States, 340 F.2d 322, 332–333, 169 Ct.Cl. 310, 328 (1965) ; Hunt & Willett, Inc. v. United States, 351 F.2d 980, 983–984, 168 Ct.Cl. 256, 262 (1964) ; Hoffman v. United States, 340 F.2d 645, 651, 166 Ct.Cl. 39, 49 (1964) ; S.T.G. Constr. Co. v. United States, 157 Ct.Cl. 409, 416 (1962) ; Appalachian Floor Co. v. United States, 144 Ct.Cl. 11, 17 (1958) ; Carlo Bianchi & Co. v. United States, 169 F. Supp. 514, 516, 144 Ct.Cl. 500, 504–505 (1959), vacated and remanded on other grounds, 373 U.S. 709, 83 S.Ct. 1409, 10

L.Ed.2d 652 (1963) ; Carman v. United States, 166 F.Supp. 759, 762, 143 Ct.Cl. 747, 751–752 (1958) ; John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 701–702, 132 Ct.Cl. 645, 653 (1955) ; Tobin Quarries, Inc. v. United States, 84 F.Supp. 1021, 1022, 114 Ct. Cl. 286, 333 (1949).

11. Chernus v. United States, 75 F.Supp. 1018, 1019, 110 Ct.Cl. 264, 267 (1948) ; Schutt Constr. Co. v. United States, 353 F.2d 1018, 1021, 173 Ct.Cl. 836, 841–842 (1965) (dicta). Cf., Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 167, 109 Ct.Cl. 517, 522 (1947).

could be contemplated and should be considered by the contractor in computing its bid.[12] Thus, these two paragraphs of the specifications, coupled with other provisions of the contract, provided ample indication of the potential water problems that would have to be faced.

Therefore, the test to be applied in deciding this case is whether the parties, from the information available to them, should reasonably have expected a material variation in the contract estimates of the water that would have to be pumped. By a clear preponderance of the evidence, plaintiff has shown that both parties should reasonably have anticipated that a substantially greater quantity of water would have to be pumped than the 302,000 units estimated by the defendant for the second stage area and that plaintiff did in fact expect such an overrun and relied on its own appraisal of the situation in submitting its bid. Several facts are especially telling.

Plaintiff's project manager, before submitting the bid on the instant contract, visited the site of the Shepherd Construction Company's erection of the overflow dike some 1,000 feet from the eastern limit of the proposed switchyard under the contract here in dispute. Although this work was being performed on dry ground inshore from the river rather than on the river bottom and at a considerable elevation above the river, the manager observed that Shepherd was encountering a large quantity of water, mostly from artesian water flowing under pressure from the rock exposed by the excavation.[13] Consequently, he concluded that large quantities of ground and artesian water existed in the area.

The experience gained by plaintiff from its own prior lock and fixed crest spillway contract put plaintiff on notice of the water-pumping hazards which would be encountered. That contract also required that the work be done in the dry; however, it contained no estimated quantity of water to be pumped on the grounds that "[q]uantities cannot be estimated and will be determined by job requirements." By addendum, defendant subsequently inserted in that proposed contract a fixed price of one cent per unit of 1,000 gallons of water pumped. Once work was started on the contract, large amounts of water flowed into the worksite from the numerous cavitites in the rock connected to the river and from the highly porous and permeable Tampa formation which underlay the site. It become economically unfeasible for plaintiff even to meter the water pumped at the one cent rate. As a result, plaintiff stopped metering after it reached 4,636,002 units. By its own calculations, plaintiff pumped an additional 1,500,000 units of unmetered water. Although there is no evidence that plaintiff ever attempted to make an accurate estimate of the quantity of water to be pumped from the second stage area, plaintiff fully expected that it would be required to pump more water for the instant contract with its site in the bed of the river than it had to pump under the prior contract performed on the higher elevation on the river bank. It is difficult for us to see how any contractor, with the same experience in the area, could have avoided that conclusion.

Prior to bidding on the instant contract, plaintiff's project manager spoke to the Government geologist assigned to the Jim Woodruff Project about the geologic and water conditions at the proposed project site. The geologist expressed the opinion that the D-zone would act as an aquaclude to prevent the passage of water, particularly artesian water

12. See Brawley v. United States, 96 U.S. 168, 171–172, 24 L.Ed. 622 (1877); Hirsch v. United States, 104 Ct.Cl. 45, 57 (1945); Thompson v. United States, 124 F.Supp. 645, 130 Ct.Cl. 1 (1954); Russ Mitchell, Inc. v. United States, 121 Ct.Cl. 582, 102 F.Supp. 544 (1952); Brock v. United States, 84 Ct.Cl. 453, 459 (1937); Morris & Cumings Dredging Co. v. United States, 78 Ct.Cl. 511, 517–518 (1933).

13. There is no record of the actual quantity of water pumped by Shepherd; however, defendant's contract estimate for the overflow dike project was 3,000,000 units.

rising up from the underlying rock. So long as the foundations for the contract structures did not penetrate the D-zone, or where the D-zone was not broken or had not been eroded away by the river, the geologist believed that grouting would sufficiently retard the inflow of water into the cofferdam areas so that the inflow could be handled by normal pumping. One of the geologic profiles, however, showed the ancient river channel and its penetration of the D-zone and so the geologist concluded that when construction would take place in this area, a serious artesian water condition would be encountered because of the absence of the D-zone.

After the bids were opened, defendant's contracting officer telephoned Mr. Perini to inquire why plaintiff had bid as much as 40 cents per unit for pumping and why its bid for cement grouting increased as the quantity of cement used increased. Mr. Perini replied that plaintiff wished to avoid a recurrence of its unfortunate experience on the first contract, where it was paid only one cent per unit for pumping instead of being paid for grouting at a higher rate. He also stated that on the instant contract plaintiff proposed to force the Government to make a more realistic choice between the comparative costs of pumping and grouting and that plaintiff's bid was designed to insure that it would be adequately compensated for the dewatering of the site under either method.

Plaintiff's original dewatering plans for the first and second stage cofferdam areas, submitted more than 8 months before any pumping was performed under the contract, provided sufficient pumping capacity to handle the quantities of water ultimately encountered in each stage.

When plaintiff's awareness of the general geologic and water conditions prevailing at the site, including the well known fact that the various limestone formations there were part of one of the most prolific and widespread artesian acquifers in the world, is added to the facts recited above, it becomes clear that plaintiff realized that the Government's estimate was far too low.[14]

The estimates for Bid Items 2 and 102 were based upon calculations made by an engineer, who was at that time defendant's Resident Engineer on the lock and fixed crest spillway contract and who later became the Resident Engineer for the instant contract. In form, the method he employed to arrive at the 323,000 and 302,000 units was a reasonable one. He first took the number of units he assumed had been pumped during the spillway contract and divided it by the number of months the pumping was performed to determine the number of units per month pumped. He then divided the quotient by the total area in square yards comprising the lock and spillway areas to arrive at an inflow factor of number of units per square yard per month. He next multiplied this factor by the area in square yards and the number of months estimated pumping time for each stage to determine the estimated units to be pumped in each stage of the instant contract.

However reasonable the formula may have been in outline form, the use of inaccurate figures and the failure to make proper adjustments and allowances for factors that should have been taken into account produced a grossly erroneous result. (See findings 23, 24 and 25). The engineer made virtually no allowance for the unmetered water pumped from the lock and fixed crest spillway area, an amount estimated at 1,500,00 units.[15]

14. One other important factor, fully discussed in findings of fact 24(i) and 26(a), from which plaintiff concluded that the Government's estimate was grossly understated was the difference in head differentials of water (average upstream pool water levels minus average foundation excavation elevations) between the lock and fixed crest spillway contract and the one here in dispute, especially with respect to the second stage area.

15. In fairness, it should be noted that the Government did not know that 1,500,000 unmetered units had been pumped. But it did know that an additional quantity

His figures for the areas for the lock and fixed crest spillway, as well as for the first and second stage areas, were inaccurate. The same was true of the actual and estimated monthly pumping figures. And, with regard to the lock and fixed crest spillway contract, no adjustment was made in attempting to compute a typical inflow rate to eliminate those months when little or no pumping was performed.

One of the most serious errors in defendant's estimate was the failure to make any allowance for the head differential of the water (level of water outside the cofferdam minus water level inside the cofferdam) between the lock and fixed crest spillway in the first contract and the gated spillway and powerhouse in the instant contract. The difference, particularly with respect to the second stage, was substantial to an extent that would foreseeably affect the amount of water to be pumped.

However, the most egregious error made was the failure to make any allowance in the second stage computations for the existence of the ancient river channel lying in the switchyard area.

But for some of the mistakes described above, the basic formula used by defendant's engineer would have provided a very accurate estimate of the water actually pumped from the first stage area and would have increased the estimate for the second stage to 3,957,072 units.

Even such a revised calculation excludes the large quantity of the unmetered water that was pumped on plaintiff's first contract and does not adequately allow for the important contribution that the existence of the old river channel would foreseeably make to the amount of pumping required in the second stage protected area.

Except for the large quantity of unmetered water on the first contract, which defendant made no effort to ascertain, there was available to defendant all of the knowledge and information which plaintiff had at the time its bid was prepared. In addition, defendant had the benefit of the "Definite Project Report," which was not furnished to plaintiff and other bidders. That report set forth the dimensions of the old river channel, and stated that in a conference held in the Office of the Chief of Engineers on April 29, 1947, "it was decided that a steel sheet piling cutoff wall would be used in lieu of a grout curtain in this trough." However, the cutoff wall was omitted from the contract. Instead, the contract drawings required plaintiff to provide a U-shaped cofferdam for the second stage with the open side facing and immediately adjacent the old river channel. Thus, the contract made no provision for a barrier across the open side to prevent the substantial inflow of water that foreseeably would emanate from the old river channel. The existence of the old river channel was plainly shown by the contract borings, and was well known to the Government geologist whom plaintiff consulted. The significance of defendants' error in this regard is demonstrated by the fact that the old river channel was a source of 60 percent to 70 percent of the water pumped from the second stage area. Sixty percent of the difference between the actual and estimated quantities of water pumped from the second stage area amounts to 3,779,290 units of pumping.

Our conclusion that the material deviation from the estimated quantity of water to be pumped did not result from a mutual mistake of fact is buttressed by our findings, which show that a considerable portion of the water pumped from the second stage area was due to change orders issued by defendant or to directions it gave plaintiff during the performance of the contract. For the purpose of sealing channels, cavities, or other passages in the rock to prevent the inflow of water into the protected area, the contract made provision for grouting to be performed by plaintiff. The amount of pumping to be done was

above the metered figure had been produced, and it did not attempt to ascertain

from plaintiffs the approximate amount of unmetered water pumped.

dependent upon the extent and effectiveness of the grouting, but the specifications left the determination of the amount of grouting to the discretion of the contracting officer and further provided that the location of the grout holes and the amount of pressure grouting required to stop the leakage would be determined by the contracting officer from time to time as the work progressed. In view of the larger exposed area in the second stage work and its proximity to the old river channel, it was reasonable for the parties to assume that the more grout used, the greater would be the volume of cavities sealed. Notwithstanding the existing conditions, the defendant ordered the use of less grout per linear foot of grout hole and per square foot of cofferdam in the second stage area than it did in the first. Moreover, the defendant used a less efficient method by requiring the plaintiff in the second stage area to limit the number of batches that were injected into each grout hole, by progressively ordering the addition of sand to the grout in order to save cement, and by reducing the pressures at which the grout was injected into the rock. But for these procedures which were ordered by the defendant, the amount of pumping in the second stage would have been materially reduced.

By various change orders which included performance by plaintiff of additional work, the Government extended the contract time by 317 days. Pumping was performed on 173 days of the extended contract time, and this necessarily resulted in a greater amount of water pumped. The average number of units pumped per day during the contract period, as extended, was 6,310. When this figure is multiplied by the additional 173 days of pumping, the product indicates that 1,095,263 units of pumping were due to the additional

period for which the contract was in force and during which pumping occurred. When the amount of additional pumping so attributed to the 173 days is substracted from the total amount pumped by plaintiff under the instant contract, the remainder is very close to the total number of units which plaintiff pumped during the performance of its first contract.

█ Thus, the situation presented by the facts before us is one where the estimated quantities contained in the contract were grossly understated by the Government. The contractor recognized that the estimate was unduly low and did not rely upon it. In view of all the information it had available to it, the Government should also have anticipated that plaintiff would encounter and have to pump more water than was pumped under the prior contract. It is in these circumstances that the Government asked ed and that it is entitled to relief therefor under the Changed Conditions article. We decline, because it has never been the purpose of that article in the contract to protect a party from the results of its own miscalculations. We have so held in many cases involving claims by disappointed contractors.[16] The same rule must be applied to the Government, for it is no more entitled to use its faulty estimate as a basis for invoking the benefit of the Changed Conditions article than is a careless contractor who makes an improvident bid.

V

█ In summary, we hold that the criteria to be applied in determining the existence of a changed condition constitute questions of law, and that since the facts of this case establish that a material variation from the erroneously computed estimated quantities was foreseeable, the defendant is not entitled to an equitable adjustment in the contract

---

16. E. g., Leal v. United States, 276 F.2d 378, 384–385, 149 Ct.Cl. 451, 463 (1960); Hirsch v. United States, 104 Ct.Cl. 45, 57 (1945); Ranieri v. United States, 96 Ct.Cl. 494, 506–507, cert. denied, 317 U.S. 690, 63 S.Ct. 264, 87 L.Ed.2d 552 (1942); General Contracting Corp. v. United States, 96 Ct.Cl. 255, 278 (1942). See also Thompson v. United States and Russ Mitchell, Inc. v. United States, supra, n. 12.

unit price on the ground that a changed condition existed. Judgment is therefore entered for plaintiff in the amount of $1,870,661.76, which represents the contract price of 40 cents per unit of water pumped during the contract period, as extended, less the amount that has already been paid to plaintiff.

As a result of our decision, the question as to whether defendant should be permitted to file its third counterclaim at such a late date is no longer of any significance in this case. Accordingly and without intimating what action we would take on a motion to file such a belated counterclaim in a case where the delay might be prejudicial to the plaintiff, it is ordered that defendant's motion for leave to file its third counterclaim is granted, and that defendant's first, second and third counterclaims are hereby dismissed.